645 A.2d 22

**John Randolph AYERS, Jr.**

v.

**STATE of Maryland.**

**No. 84, Sept. Term, 1993.**

Court of Appeals of Maryland.

·July 21, 1994.

604

Victor L. Crawford, Assigned Public Defender, (Wendy Satin, on brief), Rockville (Stephen Harris, Public Defender, on brief), Baltimore (Denise Oakes Shaffer, George S. Lemieux, on brief), Washington, DC, for petitioner.

Gary E. Bair, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

MURPHY, Chief Judge.

This case involves Maryland's "hate crimes" statute, Maryland Code (1957, 1992 Repl.Vol., 1993 Cum.Supp.) Art. 27, § 470A; subsection (b) thereof makes it a criminal offense to:

"(3) Harass or commit a crime upon a person or damage the real or personal property of:

"(i) A person because of that person's race, color, religious beliefs, or national origin...."

Section 470A(c) sets forth penalties for those who violate subsection (b); it provides:

"(1) If the violation involves a separate crime that is a felony, the person is guilty of a felony and upon conviction is subject to imprisonment for not more than 10 years, or a fine of not more than $10,000, or both.

"(2) If the violation involves a separate crime that is a felony and results in death to a victim, the person is guilty of a felony and upon conviction is subject to imprisonment

for not more than 20 years, or a fine of not more than $20,000, or both.

"(3) In all other cases, the person is guilty of a misdemeanor and upon conviction is subject to imprisonment for not more than 3 years, or a fine of not more than $5,000, or both."

Subsection (d) further provides:

"(d) —Prosecution of a person under this section does not preclude prosecution and imposition of penalties for any other crime in addition to any penalties imposed under this section."

## I

John Randolph Ayers was indicted in the Circuit Court for Montgomery County for, *inter alia*, assault, assault with intent to maim, kidnapping, conspiracy to commit a racially motivated crime, and committing a racially motivated crime in violation of § 470A(b)(3)(i). The alleged victim of these crimes was Johnnie Mae McCrae. Ayers was also indicted for like offenses alleged to have been committed against Myrtle Guillory. The counts of the indictment which charged Ayers with having violated § 470A(b)(3)(i) stated that he "unlawfully did commit a crime upon ... [the named victim] because of her race, said crime being a felony."

Ayers moved to dismiss the counts charging him with committing and conspiring to commit racially motivated crimes against Guillory and McCrae. He contended that § 470A(b)(3)(i) was unconstitutional as being "vague and not susceptible to clear understanding and therefore void." Moreover, he asserted that the statute violated the First Amendment of the Federal Constitution and the Maryland Declaration of Rights as it attempted to regulate free speech. Ayers relied upon the Supreme Court's decision in *R.A.V. v. City of St. Paul, Minnesota,* —— U.S. ——, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), to support his position that § 470A(b)(3)(i) was unconstitutional as violative of "free speech and freedom of expression."

At the hearing on the motion, Ayers maintained that "no matter how horrendous, no matter how distasteful the speech or the expression might be, there is freedom to make it." He pointed to the words of the statute which make it a crime to "harass or commit a crime upon a person ... because of that person's race, color, religious belief or national origin." Ayers argued that a state cannot constitutionally enact a content-based law which prohibits free speech. He maintained that content-based regulations are presumptively invalid and that bias-motivated speech, no matter how reprehensible, "does not justify selectively silencing speech on the basis of content." The court (Ruben, J.) denied the motion and the case proceeded to trial before a jury.

## II

The evidence at trial disclosed that on the evening of March 2, 1992, Ayers, age 22, and a friend, Sean Riley, age 20, were at Ayers's home, in the Aspen Hill section of Silver Spring, assembling a shed in the back yard and drinking beer. They worked on the shed until about 10:30 p.m. when Ayers's parents asked them to stop for the evening so they would not disturb the neighbors. The two men continued drinking beer in the house until about 12:30 a.m., finishing approximately three six-packs. They then drove Ayers's girlfriend home and at approximately 1 a.m. purchased more beer, after which they returned to Ayers's home to drink and watch television in the garage. It was during this period that Ayers and Riley, both of whom are white, discussed an incident of a racial nature which occurred at an area 7–Eleven store several nights earlier on February 29. There was evidence that the incident began when Ayers was behind a group of black teenagers in the checkout line at the store, waiting to purchase a case of beer; that Ayers bumped into one of the teenagers, after which he threw down the beer and abruptly left the store; that Ayers and Riley got into their car, made gestures with their fists, drove off and then returned to the store a few minutes later; that Ayers confronted one of the black teenagers, Terry Barbour, saying, "What did you say to me, nig-

ger?"; that Barbour was then knocked down; that Ayers shouted racial epithets, such as "nigger" and "black motherfucker"; and that Ayers then chased a black female teenager, in the course of which he called her a "black bitch," a "nigger," and a "black motherfucker."

After discussing the earlier racial confrontation at the 7–Eleven store, Ayers and Riley left Ayers's house at 2 a.m. on March 3 to look for black people to beat up. They soon observed two black women walking on Georgia Avenue. They stopped the vehicle and began walking behind the women. After the women began to run, the two men chased them. The women separated. Riley chased one of the women, Myrtle Guillory; Ayers chased the other, Johnnie Mae McCrae.

Guillory testified at the trial that as she ran she looked back, saw Ayers grab McCrae and heard McCrae scream. She testified that as Riley chased her, he yelled repeatedly, "I'm going to kill you, you black bitch." She said Riley grabbed her from behind, but she got away when he was distracted by a passing car. Guillory said she ran toward the home of David Davis, a friend. When Guillory reached Davis's yard, she began screaming for help. She ran up to the porch and began banging on the door. Davis opened the door and Riley fled.

Davis testified that he called 911 to summon the police, and an officer arrived promptly at his house. The officer took Guillory in his car to search for McCrae, during which he observed Riley walking across Georgia Avenue. After Guillory identified Riley as the man who had chased her, the officer apprehended him. When the officer patted down Riley, he found a container of charcoal lighter fluid inside his jacket.

Simultaneously with these events, Ayers had caught McCrae and dragged her into a wooded area off Georgia Avenue. Subsequently, another police officer arrived on the scene and McCrae was observed running out of the wooded area crying for help. She appeared hysterical, was naked from the waist up, and was bleeding from the head. Her

pants were wet. Police gave her a raincoat and placed her in a police cruiser. Other officers and medical personnel arrived. Officers who spoke with McCrae described her as being in shock. Several officers noted what they believed was the smell of lighter fluid on McCrae's person. The police took McCrae to a hospital.

McCrae testified that as she ran from Ayers, she fell, and Ayers grabbed her by the back of her coat collar and dragged her into the woods. She said that he began "banging her head" and told her he was going to kill her. She remembered nothing that happened after that until she was being led to an ambulance by police.

There was evidence that after Guillory identified the car driven by the two men, the police searched the vehicle, which belonged to Riley's grandmother. They found Riley's and Ayers's wallets in the glove box. The officers then searched the wooded area from which McCrae had emerged and found bloodstains, a coat, a wig, and a sweater, later identified as McCrae's. The sweater was found in a small creek which ran through the wooded area.

At approximately 3:20 a.m., police went to Ayers's house. They found him wearing bloodstained blue jeans; he also had blood on his hands and forearms. Ayers was taken into custody and thereafter signed a statement admitting that it had been his idea to attack the women. He admitted that he dragged McCrae "off the sidewalk of Georgia Avenue" and that he had sprayed her legs with lighter fluid "to scare her." In his statement, Ayers said that McCrae fell into a bush as he dragged her "from Georgia Avenue onto a bridge or trestle." He said "I was holding onto her while we were on the bridge/trestle and I noticed the roof lights of the police car nearby. I let go of her and ran. She fell into the creek at that point. When I grabbed her collar earlier, her jacket came off. I don't recall removing any other pieces of her clothing."

Testifying as a State's witness, Riley said that Ayers and he set out that night to go "nigger hunting" because they were

angry about the 7–Eleven incident, which had occurred several days earlier on February 29.[1] When asked to summarize "the nature of the confrontation," defense counsel objected. At a bench conference, defense counsel told the court that "there is another charge pending evidently of an altercation of a racial nature" which occurred at that time and that asking Riley "to go into the whole thing is improper." The prosecutor said that he did not intend to go into "any specific acts" but wanted Riley to "talk about the fact that there was a racial confrontation because that supplies the motivation . . . [b]etween [Ayers], Mr. Riley and some black people." The court said that it was "appropriate to put it in context of time [and] place." The prosecutor then said that he would not refer to "any pending charges or any crime," but just that there was "a confrontation of a racial nature." The court overruled the objection, stating that the testimony was admissible "to show motive." After the jury returned, Riley testified that he and Ayers discussed this incident as they sat drinking in Ayers's garage, and as a result they decided to look for some black people to "beat them up." He stated that Ayers initiated the idea of "burning somebody or something," and he began taking things from a shelf, first turpentine or kerosene, which he put back believing his father would notice its absence, and then charcoal lighter fluid. Riley stated that he carried beer to the car as they left the garage; he did not remember seeing Ayers carrying anything out to the car.

Riley testified further that after he fled from Davis's house, he heard a scream coming from the nearby wooded area. He stated that upon entering the woods, he saw McCrae lying motionless on her stomach on the ground. He said that McCrae's shirt was off and Ayers was kneeling over her with her head between his knees; he was hitting her in the back of the head with his fist. Riley testified that Ayers rose to his feet, pulled out a container of charcoal lighter fluid and

---

1. Prior to Ayers's trial, Riley pleaded guilty to assault with intent to maim and committing a racially motivated crime upon Guillory. Subsequent to the trial, he was sentenced to 18 months imprisonment.

sprayed McCrae from her waist to her feet in a zig-zag motion. Riley said that Ayers told him to "light her, light her," but instead he took the lighter fluid from Ayers, saying "you're crazy." He testified further that he put the container in his pocket and walked across Georgia Avenue, where he was arrested. He told police that he and Ayers had attacked the women because they were black.

Testifying on his own behalf, Ayers said that he and Riley left the garage that night merely to find another drinking spot. He suggested that they go to a wooded area and build a campfire, and they took the lighter fluid to help start the fire. He stated that as they left the garage, he handed the lighter fluid to Riley and then picked up the beer and carried it to the car. He testified that he told Riley to drive toward Georgia Avenue so they could park in a church near the wooded area and go back in the woods to drink; that as they approached their destination, he heard a "thump," as if someone had thrown something at the car, and he saw two people standing by the side of the road; that he told Riley to turn around so he could find out if and why they had thrown something at the car; that when Riley turned the car around, he rolled down the window to say something and the two people said something to him; and that, at that time, he did not know their race or gender. Ayers stated that he then told Riley to stop the car and they got out and began chasing the two people.

Ayers acknowledged in his testimony that McCrae ran toward the woods. He said that she fell down, and that he picked her up. He said that he "blacked out" after that and remembers only letting go of McCrae and seeing her fall into the creek. He denied striking her and denied ever having the lighter fluid. He said that he told police that he sprayed McCrae with lighter fluid because that was what the police wanted to hear. He denied attacking her for any racially motivated reason and stated that he was not a "racial person."

On cross-examination, over defense objection, Ayers admitted that the confrontation at the 7–Eleven store was racial in nature, but denied using any racial epithets. The prosecutor

said to Ayers: "You say you are not a racial person?" Ayers replied: "Correct." At this point, the prosecutor asked Ayers what he had done at the Glenmont 7–Eleven store in the early morning hours of February 29. Defense counsel's objection was overruled by the court. Ayers answered:

"I went in to buy a case of beer and as I came out[,] there was a countless number of black people standing out there.... We had left and when when we left [Riley] was driving dangerously out of the parking lot and they started yelling racial slurs.

"I had been drinking. I was a little fed up with what they were saying."

The court overruled defense counsel's objection to the prosecutor's inquiry as to "What were they saying." Ayers replied:

"Honky this, honky that, learn how to drive, get a life, this and that. I asked him to turn around. We turned around. I went up, I pushed the guy and that was it. We turned around, we started to walk away. After we started walking away they were, all of the people who were originally there were on the other side of Layhill Road yelling more racial slurs after everything had happened and we were starting to leave. So I then again, we ran after them."

Upon further cross-examination as to this incident, again over defense counsel's objection, Ayers admitted that he chased some black individuals because his feelings had been hurt. Ayers denied that he had a broken bottle and swung it at a fourteen-year-old black youth. At this point, defense counsel, out of the presence of the jury, moved for a mistrial on the ground that the prosecutor was "bringing up another crime which is allegedly pending against him and that based upon that he—racially motivation he has gone and tried to have him incriminate himself on another charge." Defense counsel claimed that this testimony "so biased and prejudiced this jury that I fail to see how [Ayers] can get a fair trial." The court

overruled Ayers's motion for a mistrial.[2] After the bench conference was concluded, the prosecutor said to Ayers: "You had this black kid on the ground, didn't you?" Ayers objected again; and the court overruled the objection. Ayers then acknowledged that he had "pushed him down, yes, he fell." The prosecutor next referred to a "young black lady" and asked Ayers whether he had called her "a black nigger bitch and you were going to kill her." Ayers denied that he had done so. After an objection to this testimony was overruled, the prosecutor asked whether Ayers and Riley were upset over the 7–Eleven incident. Ayers acknowledged that he was upset, and got out of the vehicle and chased the teenagers.

Ayers called nine witnesses on his behalf who testified, in substance, that he was neither a racist nor a prejudiced person, and that it was not an unusual occurrence for Ayers and his friends to go to the woods and light a fire and drink beer late at night.

After these witnesses had testified, and before the State's rebuttal witnesses testified, Ayers pressed a "preliminary matter" out of the jury's presence. He reminded the court that he had objected when he was cross-examined concerning the 7–Eleven store incident, which he characterized as "allegedly racial in nature, allegedly a fight or an assault between blacks and whites at the 7–Eleven store." Ayers said that his earlier motion for mistrial had been denied and that he wanted to renew it. Defense counsel then said:

> "... it is so prejudicial because my client stands indicted and is set for trial in the middle of November on those charges which are felony charges. I believe one of them is attempted murder on these same charges.

---

**2.** We have repeatedly held that the declaration of a mistrial is an extraordinary act which should only be granted if necessary to serve the ends of justice. The granting of such a motion, we have said, lies within the discretion of the trial judge who hears the entire case and can weigh the danger of prejudice arising from improper testimony. We will not reverse a trial court's denial of a motion for mistrial "unless the defendant was so clearly prejudiced that the denial constituted an abuse of discretion." *Hunt v. State,* 321 Md. 387, 422, 583 A.2d 218 (1990).

"He was not able to protect himself on the witness stand because Your Honor allowed [the prosecutor] to cross-examine him about bottles and 14 year old blacks on these charges which are now pending. Now I understand that [the prosecutor] might even go into that further.

"You also have the other argument that it is improper to impeach a witness on a collateral source matter or collateral matter. This whole thing came up when [the prosecutor] asked him on cross-examination are you prejudiced and he said I am not prejudiced."

Ayers claimed that the State had referred to another crime "which is now pending against him so that he cannot go into it without incriminating himself and he is not prepared with witnesses to answer these charges." Ayers then told the court that if it overruled his mistrial motion, he wanted the court to instruct the jury that any testimony concerning the incident at the 7–Eleven store was not brought out "for the truth of it" but simply to show his "state of mind."

Next, Ayers made a motion *in limine* out of the jury's presence that the prosecutor be prohibited from inquiring into the 7–Eleven incident "by bringing up other crimes." In response, the prosecutor said he had no intention of doing so. Focusing instead on Ayers's character witnesses, all of whom said he was not a racial person, the prosecutor told the court that it was appropriate for him "to confront and to explore character traits that aren't consistent with what character witnesses have said."

The court denied the motion for mistrial. Upon the jury's return to the courtroom, the court gave the jury the following cautionary instruction:

"Before the [State's rebuttal] witness is called I want to indicate to you what we refer to in this world as a cautionary instruction. You have heard and you may hear more testimony from witnesses relative to matters that appear to be other crimes or other incidents that might lend themselves to being prosecuted as crimes. But none of that testimony that you glean that from is to be received by you

as the possibility of that being a criminal act. It is just being offered to you as indication of certain factual representations relative to substantiating other proof that one or both of the parties intends to put before you. Now I know that sounds confusing. I am just suggesting to you that the indication of any witness of any other act done by the defendant in this case other than these acts that he is charged with today is not to be received or considered by you or to be used by you in a determination of your ultimate decision in this case."

Asked by the court whether he was satisfied with this instruction, defense counsel said that he was.

On rebuttal, the State called Lisa Walker, one of the young black women who had been involved in the fracas at the 7–Eleven store. Over Ayers's continuing objection, Walker recounted how Ayers had directed racial epithets at the black teenagers, had struck one of the male teenagers, and had chased her, calling her a "black bitch," a "nigger" and a "black motherfucker." Ayers moved for a mistrial, arguing out of the jury's presence, that Walker's testimony was highly prejudicial and was impermissible character evidence. He said:

"The State has not limited itself to whether or not he used the words nigger or racial slurs but has gone into a full and complete crime which is so similar to the one before us, namely chasing a woman et cetera that by attempting to show other crimes to prove this one they have so prejudiced this jury that I fail to see how in the world this man can get a fair trial."

The court denied the motion, holding that the inquiry was proper because it was offered to show motive, which was an element of the offense of committing a racially motivated crime under § 470A(b)(3)(i). Ayers then requested another limiting instruction, whereupon the court stated the following to the jury:

"[T]he cautionary instruction that I issued to you earlier relative to testimony that might indicate to you that another crime was committed applies to this, that you are not to

infer from this any particular crimes committed by the defendant of any kind but simply the basis of the words that the witness has uttered."

In its instruction to the jury, at the close of all the evidence, the court made the following statement:

"The defendant is also charged with the racially motivated crime. It is a crime to harass or commit a crime upon a person because of that person's race, color, religious beliefs, or national origin."

Counsel for Ayers did not object to the instruction. Subsequently, during its closing argument to the jury, the State made the following statement:

"What is a hate crime? Quite simply as you heard the judge tell you you can't harass or commit a crime on someone because of their race. That is it. That is the crime, and you have got to ask yourself did the defendant commit a crime upon this woman because of her race. It gets back to the motivation of why they were out on the streets to begin with. What were they trying to accomplish? They were going to harass, commit a crime, terrorize, actually, whoever happened to be black."

No exception was taken to this statement.

Ayers was found guilty of assault, assault with intent to maim, kidnapping, conspiracy to commit a racially motivated crime, and committing a racially motivated crime in violation of § 470A(b)(3)(i). He was sentenced to 10 years for conspiracy to commit a racially motivated crime against Guillory. He was further sentenced to 10 years for assault with intent to maim McCrae (the assault conviction was merged into the aggravated assault conviction); 30 years for kidnapping McCrae; and 10 years for committing a racially motivated crime against McCrae.[3] The court directed that the sentences

---

3. The count alleging conspiracy to commit a racially motivated crime against McCrae was merged into the count alleging the racially motivated crime.

run consecutively, for a total of 60 years. At Ayers's sentencing, the court said:

"I think what this case cries out for is punishment of the act. I have heard the good things about you, and I have no reason to doubt them, but the act was a vicious act. The act was an unfair act, and the act itself cries out for punishment and severe punishment. Whether or not this successfully serves as a deterrent, none of us will ever know. We just hope these acts don't take place. I think it was a vicious act. I think in another place or day you would be leading the pack in that white sheet dreadful uniform that is still used here and there."

Ayers appealed. We granted certiorari prior to appellate review by the intermediate appellate court to consider the questions of public importance presented by the case.

### III

Ayers argues that § 470A violates the First and Fourteenth Amendments to the United States Constitution because that part of § 470A(b)(3)(i) which prohibits harassment of someone because of race, color, religious beliefs or national origin is unconstitutionally vague and substantially overbroad. He argues that the undefined term "harass" is so vague that it does not provide fair notice to individuals as to what behavior is proscribed and it creates a danger of arbitrary enforcement. He argues also that the statute is impermissibly vague because it prohibits harassment without requiring a specific intent to harass.

Ayers urges that the statute is overbroad because the term "harass" could encompass any words, gestures or conduct which "annoy" another person. He argues that the "harass" prong of the statute is a content-based regulation of speech which cannot be justified by the State. He also maintains that § 470A, which creates a separate criminal offense, is not narrowly tailored because the State could better advance its interest in deterring bias-motivated crime by instead enacting a penalty enhancement statute. Ayers suggests that because

the statute implicates First Amendment rights, he may challenge it, not only as it applies to him, but on its face.

Ayers acknowledges that he was not charged with the harassment prong of § 470A(b)(3), but with the second prong, which prohibits committing a crime based upon the victim's race, color, religious beliefs, or national origin. As to this prong, he raises no constitutional challenge, under the First and Fourteenth Amendments. Instead, he challenges the harassment prong, arguing that the jury may have convicted him of racially motivated harassment based upon the court's jury instructions and the State's closing argument, in both of which the words of subsection (b)(3) of the statute were recited. He argues that the jury was, in effect, told that it could convict Ayers of committing the separate crime if it found that he either harassed McCrae or committed a crime against her because of her race.

In addition to his facial challenges to § 470A, Ayers contends that the statute is unconstitutional as applied in his case because, pursuant to the statute, the court allowed the admission in evidence of prejudicial and irrelevant information, thereby preventing him from receiving a fair trial. He argues that the evidence of the February 29 incident at the 7–Eleven store was highly prejudicial because of the danger of it being considered as indicative of a propensity on his part to commit a racially motivated crime; that the 7–Eleven incident was so similar to the incident for which he was on trial that it was impossible for the jury not to treat it as propensity evidence; and that evidence of other crimes or bad acts for which a defendant is not on trial must be considered carefully by the court, weighing probative value against prejudicial impact. As to this, Ayers urges that the court erred in not conducting this balancing test. He states also that the court erred in not requiring the State to establish by clear and convincing evidence the prior acts attributed to Ayers. He further maintains that the court erred in determining that Walker's testimony concerning the 7–Eleven incident was relevant to show motive because her testimony did not provide a nexus between that incident and the crimes for which Ayers was on trial. He

also observes that both he and Riley had testified that the incident at the store took place; that Riley had provided evidence that the incident motivated Ayers's actions of March 3; and that because both he and Riley admitted that the incident occurred, Walker's testimony describing the occurrence was not relevant rebuttal evidence but, rather, extrinsic proof of a collateral issue. Therefore, Ayers says that Walker's testimony was merely cumulative; and particularly because it was so inflammatory, it should not have been permitted in evidence.

Ayers next contends that the limiting instruction given by the court before receiving Walker's testimony increased the likelihood of prejudice because it did not instruct the jury that Walker's testimony was relevant only as to motive.

Ayers claims also that there was legally insufficient evidence to convict him under § 470A because the only evidence that his acts of March 3 were racially motivated came from his accomplice, Riley. Consequently, Ayers suggests that his conviction violates a longstanding rule that a person may not be convicted upon the uncorroborated testimony of an accomplice.

And, finally, Ayers argues that the court abused its discretion in sentencing him to 60 years imprisonment. He asserts that the sentence is so oppressive as to constitute cruel and unusual punishment under the Eighth Amendment to the Federal Constitution and Articles 16 and 25 of the Maryland Declaration of Rights. He maintains that his 30-year sentence for kidnapping is particularly disproportionate, because he moved the victim no more than several feet in the course of the criminal episode.[4] He argues that the court's statements at sentencing demonstrated a lack of neutrality or detachment.

The State argues that Ayers lacks standing to challenge the harassment prong of the statute because his conduct of March

---

4. Ayers does not contend that the State failed to prove all the elements of the crime of kidnapping. Maryland Code (1957, 1992 Repl.Vol.) Art. 27, § 337, sets forth a maximum 30-year penalty for a conviction of the crime of kidnapping.

3 lacked any expressive element that would implicate the First Amendment. Further, the State observes that Ayers was not charged in the indictment with "harassing" the women, and it therefore is clear that the jury convicted Ayers of violating § 470A based on his commission of the other crimes charged in the indictments.

The State further asserts that even if we reach the constitutional issue, Ayers's challenge must fail because the harassment prong of the statute is not vague, overbroad or impermissibly content-based. The State maintains that the word "harass" can readily be defined so as to provide notice to persons of common intelligence. As to Ayers's overbreadth challenge, the State maintains that Ayers has not demonstrated a substantial likelihood or danger that the mere existence of the statute has a chilling effect on the protected speech of third parties. The State further contends that even if Ayers is permitted to challenge the statute based upon its overbreadth, the statute will survive scrutiny because it does not reach a substantial amount of constitutionally protected conduct. The State argues that any overbreadth problem would more appropriately be resolved by a narrowing construction that would include only a pattern of behavior rising to the level of conduct rather than merely speech. As to Ayers's challenge of the statute as an impermissible content-based regulation of speech, the State avers that § 470A is similar to penalty enhancement statutes, and such statutes have been upheld as constitutional.

The State responds to Ayers's assertion that the testimony regarding the confrontation at the 7–Eleven was admitted in error by asserting that it is not impermissible per se to admit evidence regarding a defendant's beliefs and that speech may be used to establish the elements of a crime or to prove motive or intent. As to Ayers's contention that the evidence was inadmissible as evidence of a prior bad act or crime, the State maintains that the evidence was admissible because it was relevant to a material fact, that is, racial motivation; Ayers did not object to the evidence when it was first admitted through Riley's testimony in the State's case-in-chief; and the

evidence was proper rebuttal to the testimony of Ayers and his nine witnesses. The State maintains that by overruling motions for mistrial and giving cautionary instructions the court demonstrated that it considered the probative value of the evidence greater than its prejudicial effect. The State avers that the testimony of Walker was not collateral because it was related to a material fact; thus it was clearly admissible extrinsic evidence.

As to the sufficiency of evidence based on lack of corroboration of the accomplice's testimony, the State argues that the accomplice corroboration rule does not require corroboration of specific details of an offense but merely that the person was identified with the crime or participated in the crime itself, of which there is ample evidence.

The State responds to Ayers's final contention, that his sentence is cruel and unusual, by stating that the sentence is not constitutionally disproportionate. The State contends that Ayers's argument that the trial judge was motivated by ill-will is not properly before us because no objection was made below. The State asserts that the sentences are not cruel and unusual, there is no evidence of an abuse of discretion on the part of the sentencing judge and the sentences were within the statutory maximum. It concludes, therefore, that there is no basis for reversal.

## IV

The First Amendment's protection against laws which abridge an individual's freedom of speech is applicable to state governments through the Fourteenth Amendment. *Eanes v. State,* 318 Md. 436, 445, 569 A.2d 604, *cert. denied,* 496 U.S. 938, 110 S.Ct. 3218, 110 L.Ed.2d 665 (1990). The Fourteenth Amendment is also the source of the due process principles which form the basis of the vagueness doctrine. *Id.,* 318 Md. at 459, 569 A.2d 604. These principles are based upon two beliefs. "The first is that one should not 'be required at peril of life, liberty, or property to speculate as to the meaning of penal statutes. All are entitled to be informed

as to what the State commands or forbids.'" *Williams v. State*, 329 Md. 1, 8, 616 A.2d 1275 (1992) (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939)). The second belief is that "laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).[5]

Generally, the constitutionality of a statute challenged on vagueness grounds must be considered as applied to the facts of the particular case. *Bowers v. State*, 283 Md. 115, 122, 389 A.2d 341. Where, however, the statute appears to impinge upon fundamental constitutional rights such as the First Amendment guarantees of free speech and assembly, the statute is tested for vagueness on its face because its indefiniteness may have a chilling effect on the exercise of First Amendment liberties. *Id.* at 122–23, 389 A.2d 341. This

---

5. As to unconstitutional vagueness, *see also Coates v. City of Cincinnati*, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971) (ordinance forbidding persons from assembling and conducting themselves in manner annoying to passersby was vague, not in the sense that it required a person to conform his conduct to an imprecise standard, but in the sense that it specified no standard of conduct at all); *Cox v. State of Louisiana*, 379 U.S. 536, 551, 85 S.Ct. 453, 462, 13 L.Ed.2d 471 (1965) (invalidating as unconstitutionally vague a statute which defined breach of the peace as "to agitate, to arouse from a state of repose, to molest, to interrupt, to hinder, to disquiet"); *Screws v. United States*, 325 U.S. 91, 101, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495 (1945) ("[T]he requirement of a specific intent to do a prohibited act may avoid those consequences to the accused which may otherwise render a vague or indefinite statute invalid.").

As to unconstitutional overbreadth resulting from vagueness, see *Grayned, supra*, 408 U.S. at 114–15, 92 S.Ct. at 2302 (statute is overbroad if it "sweeps within [it] . . . what may not be punished under the First and Fourteenth Amendments"); *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 801, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984) (for a statute to be facially challenged on overbreadth grounds, "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court").

principle is, in essence, a rule of standing which allows a defendant to challenge the validity of a statute even though the statute as applied to the defendant is constitutional. *Id.*

Challenged here as unconstitutionally vague under the First and Fourteenth Amendments is the portion of subsection (b)(3)(i) of § 470A which provides that "[a] person may not harass ... [a] person because of [the victim's] race, color, religious beliefs or national origin." The statute does not define the term "harass"; nor does it expressly require a specific intent to harass.

■ Section 470A(b)(3)(i)'s prohibition against harassing someone based on race, color, national origin or religious beliefs, if construed to include merely speech that annoys or offends, would appear to target squarely certain speech based upon the destructive nature of its message. Harassing speech based only upon one or more of four specific characteristics is proscribed by the statute.

If the indictment in this case charged Ayers with the crime of "harassment," we would be required to pass upon the constitutional vagueness, and claimed overbreadth, of that undefined term. We need not reach that question because Ayers was not so charged. Thus, while the term "harass" in the context of § 470A(b)(3) may raise constitutional concerns, we need not here address the statute's constitutionality on that premise.

As we noted above, Ayers does not argue that § 470A was unconstitutionally vague and overbroad as applied to crimes charged against him. He makes no claim that during the acts in question he was engaged in conduct that was protected by the First Amendment. Rather, he asserts a facial challenge to the statute and argues that if we strike down the harassment portion of § 470A(b)(3), we must then reverse his conviction under that statute. It is clear, however, that even under the special standing rule applicable with regard to statutes involving First Amendment interests, a defendant may not raise a facial challenge to portions of a statute under which he or she was not convicted. *See Colten v. Commonwealth of Kentucky,*

407 U.S. 104, 112 n. 3, 92 S.Ct. 1953, 1958 n. 3, 32 L.Ed.2d 584 (1972). And, as we earlier stated, Ayers was neither charged nor convicted under the harassment portion of § 470A(b)(3). Ayers asserts, however, that he should be allowed to challenge the statute facially because there is a possibility that he may have been convicted under the harassment prong. He maintains that the jury may have convicted him of harassment on the basis of the court's jury instructions and the prosecutor's closing argument. He relies upon *Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117, (1931); and *Street v. New York*, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969), in support of his argument that if his conviction could possibly have been based on an unconstitutional ground, it must be reversed.

In *Stromberg*, the Court reversed the defendant's conviction based on a general verdict of guilty for the offense of displaying a red flag for one of three purposes. The Court determined that a conviction based upon one of the purposes (to express opposition to organized government) was unconstitutional. Because it was impossible to determine that the defendant's conviction had not been based upon the unconstitutional prong of the statute, the Court held that the conviction must be reversed. 283 U.S. at 370, 51 S.Ct. at 536.

In *Street*, the Court reversed the defendant's conviction for the offense of burning an American flag and shouting "We don't need an American flag," under a statute which made it unlawful to cast contempt upon the flag "either by words or act." 394 U.S. at 578–79, 89 S.Ct. at 1358–59. The Court held that the statute was applied unconstitutionally in the defendant's case because "it permitted him to be punished merely for speaking defiant or contemptuous words about the American flag." *Id.* at 581, 89 S.Ct. at 1360. The Court concluded that

"when a single-count indictment . . . charges the commission of a crime by virtue of the defendant's having done both a constitutionally protected act and one which may be unprotected, and a guilty verdict ensues without elucidation, there is an unacceptable danger that the trier of fact will have

regarded the two acts as 'intertwined' and have rested the conviction on both together."

*Id.* at 588, 89 S.Ct. at 1363–64. The Court added, however, that

> "[t]here is no comparable hazard when the indictment or information is in several counts and the conviction is explicitly declared to rest on findings of guilt on certain of those counts, for in such instances there is positive evidence that the trier of fact considered each count on its own merits and separately from the others."

*Id.* at 588, 89 S.Ct. at 1364.

We disagree with Ayers that these cases mandate a reversal of his conviction under § 470A. In *Stromberg,* the defendant was charged under all three prongs of the statute. As we earlier stated, the indictment against Ayers contained no count based on the harassment prong of § 470A(b)(3). He was charged, as to § 470A, only with conspiracy to commit and committing a racially motivated crime. In *Street,* the defendant's conviction was reversed because the statute, *as applied to the defendant,* permitted him to be punished for constitutionally protected conduct. Here, the record is devoid of evidence that, during the incident involving Guillory and McCrae, Ayers was engaged in any semblance of constitutionally protected speech or conduct directed at the victims which was considered by the jury in its determination of guilt as to the count based on § 470A. As the Supreme Court observed in *Wisconsin v. Mitchell,* —— U.S. ——, ——, 113 S.Ct. 2194, 2199, 124 L.Ed.2d 436 (1993), "a physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment."

As we earlier noted, counsel for Ayers raised no objection to statements by the State and the court in which the word "harass" was included. Maryland Rule 8–131 provides that an appellate court ordinarily will not decide an issue unless it plainly appears by the record to have been raised below. In particular, Maryland Rule 4–325 provides that a party who fails to object to a jury instruction at trial may not

later raise the issue on appeal; however, the appellate court may take cognizance of any plain error in an instruction. Plain error is "error which vitally affects a defendant's right to a fair and impartial trial." *Richmond v. State*, 330 Md. 223, 236, 623 A.2d 630 (1993) (quoting *State v. Daughton*, 321 Md. 206, 211, 582 A.2d 521 (1990)). We have limited our review to circumstances which are "compelling, extraordinary, [or] exceptional, or fundamental to assur[ing] the defendant a fair trial." *Richmond, supra,* 330 Md. at 236, 623 A.2d 630 (quoting *State v. Hutchinson,* 287 Md. 198, 203, 411 A.2d 1035 (1980)).

We do not find that to be the case here. Clearly, if given the opportunity to correct or clarify its instruction, the court might have done so. Moreover, we find no merit in Ayers's argument that statements made during the trial were so misleading as to create the danger that the jury convicted Ayers of "racially motivated harassment." Based upon the fact that the indictment and verdict sheet stated that Ayers was charged, as to § 470A, only with committing racially motivated crimes, the court's mere recital of § 470A(b)(3) in its entirety, as we see it, was not enough to lead the jury to conclude that Ayers was charged with and could be convicted for mere harassment in addition to committing a crime based upon the protected statutory characteristics. And although the prosecutor also recited the substance of subsection (b)(3) saying "you can't harass or commit a crime on someone because of their race," in this regard he told the jury "you have got to ask yourself did the defendant *commit a crime* upon this woman because of her race." And, again, the jury had before it no evidence that Ayers engaged in any conduct as to McCrae—expressive or otherwise—that did not constitute a part of the underlying crimes with which he was charged.

And finally, we note that Ayers was, in fact, convicted of committing several distinct crimes in addition to the conviction under § 470A, and that Ayers has not challenged the legal sufficiency of the evidence to support those convictions. It must reasonably be concluded that the jury based its convic-

tion under § 470A upon the finding that he was guilty of committing the underlying crimes and that, in the words of the statute, the crimes were perpetrated upon a person "because of that person's race."

We therefore conclude that Ayers lacks standing to challenge the statute facially on the basis that the harassment prong of § 470A is vague and overbroad.

## V

■ Ayers asserts that § 470A was unconstitutionally applied to him because, based upon the statute, the trial court permitted the admission of prejudicial and irrelevant testimony.[6] As to this, Ayers maintains that testimony relating to the February 29 incident at the 7–Eleven store was improperly admitted because it constituted evidence of other crimes. Specifically, he argues that the State improperly introduced such evidence when it cross-examined Ayers about the Febru-

---

6. Ayers further alleges that the statute unconstitutionally permits broad inquiry into a defendant's beliefs and associations. This argument, that the First Amendment precludes inquiry into a defendant's beliefs under all circumstances, was foreclosed by the Supreme Court in *Mitchell*. There, the Court said that "[t]he First Amendment ... does not prohibit the evidentiary use of speech [or beliefs] to establish the elements of a crime or to prove motive or intent." —— U.S. at ——, 113 S.Ct. at 2201. As earlier stated, Ayers also argues that § 470A is not narrowly tailored in that it creates a separate criminal offense rather than simply an enhancement of the penalty for the underlying offense. He asserts that the creation of a separate crime which requires proof of bias-motivation at trial is unnecessary and that it creates the danger of admission of highly prejudicial evidence. But, as the Supreme Court stated in *Mitchell*, antidiscrimination laws, which require the introduction at trial of evidence of motive based upon protected characteristics, have been upheld against constitutional challenges. —— U.S. at ——, 113 S.Ct. at 2200. And as the *Mitchell* Court also stated, the legislature has the primary responsibility for fixing criminal penalties. *Id.* It may choose to do so by enacting a separate criminal offense statute rather than a penalty enhancement provision. Under either approach, the penalty for the underlying crime is enhanced. We acknowledge that § 470A raises evidentiary issues which would not be present in a penalty enhancement statute; however, evidence as to bias-motivation is subject to the same evidentiary rules as to relevance, probative value, and prejudicial effect which govern the introduction of motive or intent evidence for other crimes.

ary 29 7–Eleven incident, and when it introduced Walker's rebuttal testimony regarding that incident.[7]

We have frequently enunciated the general rule that evidence of a defendant's prior criminal acts may not be introduced to prove guilt of the offense for which the defendant is on trial. *See Terry v. State,* 332 Md. 329, 334, 631 A.2d 424 (1993); *Clark v. State,* 332 Md. 77, 83, 629 A.2d 1239 (1993); *State v. Faulkner,* 314 Md. 630, 633, 552 A.2d 896 (1989); *Straughn v. State,* 297 Md. 329, 333, 465 A.2d 1166 (1983); *Cross v. State,* 282 Md. 468, 473, 386 A.2d 757 (1978); *Ross v. State,* 276 Md. 664, 669, 350 A.2d 680 (1976); *Bryant v. State,* 207 Md. 565, 586, 115 A.2d 502 (1955). Therefore, "in a prosecution for a particular crime, evidence which in any manner shows or tends to show that the accused has committed another crime wholly independent of that for which he is on trial, even though it be a crime of the same type, is ... inadmissible." *Ross, supra,* 276 Md. at 669, 350 A.2d 680.

The reasons for this general exclusionary rule are well documented:

"There are two reasons for the rule. First, if a jury considers a defendant's prior criminal activity, it may decide to convict and punish him for having a criminal disposition. Second, a jury might infer that because the defendant has committed crimes in the past, he is more likely to have committed the crime for which he is being tried."

*Straughn, supra,* 297 Md. at 333, 465 A.2d 1166. *See also Terry, supra,* 332 Md. at 334, 631 A.2d 424 (other crimes

7. In this regard, the jury heard Ayers's testimony that he had merely "pushed" a black teenager and that he "fell" down. He denied making racial epithets during the 7–Eleven confrontation, although he admitted chasing the teenagers because they had uttered racial slurs against him. Walker's testimony was that Ayers had "struck" the teenager and that the teenager was "knocked down."

The jury did not know whether Ayers had been charged or convicted for any criminal acts growing out of the 7–Eleven incident. The record discloses, however, that Ayers was subsequently charged with and convicted of destruction of property and reckless endangerment in connection with the 7–Eleven fracas.

evidence "is excluded because it may tend to confuse the jurors, predispose them to a belief in the defendant's guilt, or prejudice their minds against the defendant").[8]

There are, however, well-recognized exceptions to this general rule. Evidence of other crimes may be admitted if "it is substantially relevant to some contested issue in the case and if it is not offered to prove the defendant's guilt based on propensity to commit crime or his character as a criminal." *Faulkner, supra,* 314 Md. at 634, 552 A.2d 896. *See also Terry, supra,* 332 Md. at 334, 631 A.2d 424. Stated differently, evidence of prior bad acts is admissible if it has "special relevance." *See Terry, supra,* 332 Md. at 334, 631 A.2d 424; *Harris v. State,* 324 Md. 490, 500, 597 A.2d 956 (1991).

On many occasions, we have stated that evidence of other crimes is admissible if it tends to establish (1) motive, (2) intent, (3) absence of mistake, (4) a common scheme or plan, or (5) identity. *See Terry, supra,* 332 Md. at 334–35, 631 A.2d 424; *Faulkner, supra,* 314 Md. at 634, 552 A.2d 896; *Straughn, supra,* 297 Md. at 333 n. 3, 465 A.2d 1166; *Ross, supra,* 276 Md. at 669–70, 350 A.2d 680. Admissibility of prior bad acts, however, is not limited to this finite list of exceptions. *See Harris, supra,* 324 Md. at 497, 597 A.2d 956. For example:

> "If evidence of another crime tends directly to prove the defendant guilty of the crime for which he is being tried, or if the other crime charged is so linked together in point of time or circumstances that one cannot be fully shown with-

---

**8.** We have commented that other crimes evidence is inadmissible because it is irrelevant. *See, e.g., Clark v. State,* 332 Md. 77, 83, 629 A.2d 1239 (1993); *Ross, supra,* 276 Md. at 669, 350 A.2d 680. Common sense, however, dictates that evidence of other bad acts is in fact relevant in most cases; rather, the reason for the exclusion of such evidence is that it is generally too prejudicial. *See Harris v. State,* 324 Md. 490, 495, 597 A.2d 956 (1991). One commentator has said:

> "Other crimes evidence is not excluded because it is irrelevant, but rather because of the serious danger it will be so overwhelming that the defendant cannot get a fair trial."

Joseph F. Murphy, Jr., *Maryland Evidence Handbook,* § 510, at 287 (2d ed. 1993).

out proving the other, regardless of whether the crime incidentally shown is of the same or a different character from the one on trial, the general rule of exclusion does not apply."

*Bryant, supra,* 207 Md. at 586, 115 A.2d 502. *Ross, supra,* 276 Md. at 670, 350 A.2d 680. *See also Acuna v. State,* 332 Md. 65, 72, 629 A.2d 1233 (1993) (recognizing exception that permits the State to show a defendant's propensity for illicit sexual relations under certain circumstances).

With the existence of so many exceptions to the general exclusionary rule, we have recognized that the exceptions "appear to swallow the rule." *Cross, supra,* 282 Md. at 473, 386 A.2d 757. Nevertheless, because of the potential danger involved, the admission of other crimes evidence must be closely scrutinized by the courts. *See Faulkner, supra,* 314 Md. at 634, 552 A.2d 896; *Ross, supra,* 276 Md. at 671, 350 A.2d 680.

We recently outlined a three-step procedure to be followed by a trial court when determining whether to admit evidence of other criminal acts:

" 'When a trial court is faced with the need to decide whether to admit evidence of another crime—that is, evidence that relates to an offense separate from that for which the defendant is presently on trial—it first determines whether the evidence fits within one or more of the *Ross* exceptions. That is a legal determination and does not involve any exercise of discretion.

" 'If one or more of the exceptions applies, the next step is to decide whether the accused's involvement in the other crimes is established by clear and convincing evidence....

" 'If this requirement is met, the trial court proceeds to the final step. The necessity for and probative value of the 'other crimes' evidence is to be carefully weighed against any undue prejudice likely to result from its admission. (citations omitted). This segment of the analysis implicates the exercise of the trial court's discretion.' "

*Terry, supra,* 332 Md. at 335, 631 A.2d 424 (quoting *Faulkner, supra,* 314 Md. at 634–35, 552 A.2d 896).

■ Under the first prong, a court must find an exception to the general prohibition against the admission of other crimes evidence. In the instant case, the trial court ruled that the evidence of Ayers's participation in the February 29 altercation at the 7–Eleven store (and the racial nature of the incident) was admissible because it was relevant to motive. We agree.

In order to prove a case under § 470A(b)(3)(i), the prosecution is required to show that a defendant has committed a crime upon a person "because of that person's race." Thus, motive is an essential element of the crime. Riley testified that the February 29 incident was the driving force behind the attacks on McCrae and Guillory on March 3. He further testified that the racial nature of the prior incident provided the incentive for the two men to go "nigger hunting" on the evening in question. Consequently, Riley's testimony was especially germane to Ayers's motive, which was directly at issue as an element of the crime to be established beyond a reasonable doubt.

■ Walker's testimony therefore was properly admitted as it corroborated Riley's statement that the 7–Eleven incident was racial in nature. It was not merely cumulative as Ayers suggests; rather, it not only supported Riley's testimony that the prior incident involved a racial confrontation, but refuted Ayers's testimony that he uttered no racial epithets in the course of the 7–Eleven store incident. In *Faulkner, supra,* we made the following relevant observation:

> "The only direct evidence, from Faulkner's accomplice, Peavy, must be corroborated, because a conviction cannot stand on the uncorroborated testimony of an accomplice. This corroborative evidence, including the 'other crimes' evidence, is not merely cumulative in establishing Faulkner's guilt. It was reasonably necessary and served an appropriate probative purpose. In other words, it did more

than suggest to the jury that Faulkner was a bad man or had a propensity to commit crimes."

314 Md. at 642–43, 552 A.2d 896.

In this case, the evidence supplied by Walker supported Riley's testimony establishing the causal connection between the February 29 and March 3 events—a connection which Ayers disavowed. Therefore, Walker's testimony was properly admitted to prove Ayers's racial motivation.

The next step requires a court to determine whether the accused's involvement in the prior criminal acts is established by clear and convincing evidence. In the case before us, Ayers admitted that the 7–Eleven incident occurred on February 29; however, he denied that he uttered any racial epithets during the confrontation. Riley testified that the incident was racial in nature and Walker testified that Ayers yelled racial epithets during the altercation. Based on the testimony adduced at trial, we find that the trial court properly concluded that the assault by Ayers on February 29, and the racial nature of the attack, was established by clear and convincing evidence.

The final step requires a court to weigh the necessity for and probative value of the other crimes or bad acts evidence against any undue prejudice likely to result from their admission. In this regard, the trial judge, out of the jury's presence, heard arguments on both sides of the admissibility of this evidence. As earlier indicated, the jury had heard Ayers's version of the 7–Eleven incident as well as Walker's depiction of the encounter. The jury also had before it Ayers's testimony that his attack on McCrae was not racially motivated, that he had uttered no racial epithets during the confrontation at the 7–Eleven store, and that he chased the teenagers because they had uttered racial slurs against him. Walker's testimony was that Ayers had knocked the teenager down, uttered racial epithets and chased and threatened the teenagers. The court recognized the vital importance of proof of racial motivation for conviction under § 470A. Although the jury did not know that any criminal

charges had been filed against Ayers, the trial judge gave cautionary instructions to the jury that it was not to consider any of Ayers's actions at the 7–Eleven store in arriving at its verdict.

The probative value of the evidence growing out of the 7–Eleven incident was great because it took place only a few days before the March 3 attacks upon the victims in the present case, and was relied upon by the State as the motivating factor for Ayers's actions. This evidence was therefore relevant to establish that, contrary to Ayers's testimony that he did not act with racial motives in the early morning hours of March 3, he in fact committed the crimes upon the victims on that date because of their race.

We recognize that the prejudicial effect of this evidence could arguably cause a jury to infer that because Ayers was involved in an earlier racial incident he was more likely to have committed the attack on McCrae because of her race. Moreover, evidence of a prior racial incident could arouse a jury's prejudice or hostility toward a defendant. *See Eiler v. State,* 63 Md.App. 439, 453–54, 492 A.2d 1320 (1985). However, the applicable test is not whether the other crimes evidence is prejudicial, but rather whether its probative value outweighs its prejudicial impact.

The State was required to prove that Ayers perpetrated the crimes upon the victims because of their race. Manifestly, the evidence of the 7–Eleven store racial incident could properly be found to constitute the motivation underlying Ayers's criminal misconduct in this case; it was therefore admissible to prove the motive element under § 470A. Consequently, the necessity for and probative value of this evidence in the circumstances was properly determined to outweigh its prejudicial impact.

Maryland Rule 1–502(a) requires "a preliminary determination of probativeness and potentially unfair prejudice for *all* convictions used to impeach credibility." *Beales v. State,* 329 Md. 263, 270, 619 A.2d 105 (1993) (emphasis in original). As we said in *Beales,* there is a "strong presumption" that judges

properly perform their duties in weighing the probative value and prejudicial effect of so-called "other crimes" evidence. *Id.* at 273, 619 A.2d 105. In this regard, we recognized that trial judges "are not obliged to spell out in words every thought and step of logic" in weighing the competing considerations. *Id.* It is readily evident from the record in this case that the trial judge was fully aware of the governing rule; that he appreciated the importance of the evidence of racial motivation; that the prejudicial effect of the so-called "other crimes" or "bad acts" associated with the 7–Eleven incident was outweighed by the probative value of this evidence; and that from colloquy with counsel at the bench out of the jury's presence, and the trial judge's subsequent cautionary instructions to the jury, the trial judge did not err in denying Ayers's several mistrial motions and permitting the evidence to be placed before the jury.

■■■■ Ayers further argues that the application of § 470A unconstitutionally permitted the admission of prior racist statements and placed him in a position that required him to prove that he was not a racist. With regard to this assertion, we find the following statement by one of the amicus curiae in this case particularly pertinent:

> "At a minimum, any speech or association that is not contemporaneous with the crime must be part of the chain of events that led to the crime. Generalized evidence concerning the defendant's racial views is not sufficient to meet this test."

*See Brief of Amicus Curiae ACLU of Maryland and ACLU of National Capital Area* at 13 n. 9. We conclude that the evidence and the speech relating to the 7–Eleven incident was not generalized evidence concerning Ayers's racial views; rather, it was unquestionably "part of the chain of events that led to the crime[s]" for which Ayers was ultimately convicted. Moreover, it is worth reiterating that the "First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive." *Mitchell, supra,* —— U.S. at ——, 113 S.Ct. at 2201.

We agree with the Attorney General's view of § 470A, namely that only speech actually connected with the offense should be used as evidence of motivation. Because there was such a "tight nexus" between the February 29 and March 3 incidents, we hold that admitting the evidence regarding the 7–Eleven incident did not violate the First Amendment, nor did it violate the rule which generally prohibits the introduction of other crimes evidence.[9]

## VI

Ayers next argues that there was insufficient evidence to convict him under § 470A because the only evidence relating to racial motivation came from Ayers's accomplice, Riley. Ayers points to the well-established law in Maryland that a person accused of a crime may not be convicted on the uncorroborated testimony of an accomplice. *See Faulkner, supra,* 314 Md. at 642–43, 552 A.2d 896; *Turner v. State,* 294 Md. 640, 641–42, 452 A.2d 416 (1982); *Brown v. State,* 281 Md. 241, 246, 378 A.2d 1104 (1977); *Watson v. State,* 208 Md. 210, 217, 117 A.2d 549 (1955).

> "The reason for the rule requiring the testimony of an accomplice to be corroborated is that it is the testimony of a person admittedly contaminated with guilt, who admits his participation in the crime for which he particularly blames the defendant, and it should be regarded with great suspicion and caution, because otherwise the life or liberty of an innocent person might be taken away by a witness who

---

**9.** The fact that some of the evidence relating to the February 29 incident was provided at the rebuttal stage, rather than during the prosecution's case-in-chief, does not require reversal of Ayers's convictions. It is within the sound discretion of the trial court to allow evidence in rebuttal that could have been offered in the State's case-in-chief. *See State v. Hepple,* 279 Md. 265, 270–71, 368 A.2d 445 (1977); *Mayson v. State,* 238 Md. 283, 288–89, 208 A.2d 599 (1965). Indeed, Walker's testimony that Ayers "struck" one of the black teenagers and that he was "knocked down" contradicts Ayers's testimony that he merely "pushed the guy and that was it," and that the teenager "fell." Walker's testimony describing the racial confrontation also contradicted Ayers's testimony that he uttered no racial epithets in the course of the encounter.

makes the accusation either to gratify his malice or to shield himself from punishment, or in the hope of receiving clemency by turning State's evidence."

*Watson, supra,* 208 Md. at 217, 117 A.2d 549. Notwithstanding the important reasons behind the rule, we have explained that only slight corroboration is required. *See Turner, supra,* 294 Md. at 642, 452 A.2d 416, *Brown, supra,* 281 Md. at 244, 378 A.2d 1104. In *Brown,* we said:

"Not much in the way of evidence corroborative of the accomplice's testimony has been required by our cases. We have, however, consistently held the view that while the corroborative evidence need not be sufficient in itself to convict, it must relate to material facts tending either (1) to identify the accused with the perpetrators of the crime or (2) to show the participation of the accused in the crime itself. If with some degree of cogency the corroborative evidence tends to establish either of these matters, the trier of fact may credit the accomplice's testimony even with respect to matters as to which no corroboration was adduced. That corroboration need not extend to every detail and indeed may even be circumstantial is also settled by our cases."

281 Md. at 244, 378 A.2d 1104.

It is clear from these cases that corroboration is necessary only when criminal agency has not been established. As our cases indicate, we have repeatedly held that when a conviction is based upon the testimony of an accomplice, there must be some independent corroboration establishing the defendant's criminal agency. *See Turner, supra,* 294 Md. at 641–42, 452 A.2d 416, and cases cited therein.

Ayers's involvement in the 7–Eleven incident and the attack on McCrae was thoroughly established by the evidence. Ayers admitted his participation in both incidents and the testimony of Walker and various police officers also supported this conclusion. Consequently, it was unnecessary to corroborate Riley's testimony regarding Ayers's motive.

## VII

Finally, Ayers asserts that the sentence imposed by the trial court was so excessive and oppressive as to evidence an abuse of discretion and to constitute cruel and unusual punishment under the Eighth Amendment to the United States Constitution [10] and Articles 16 and 25 of the Maryland Declaration of Rights. [11] In particular, he argues that the thirty-year sentence for kidnapping is excessive, even though that sentence is within the statutory limits as set forth in Maryland Code (1957, 1922 Repl.Vol.) Art. 27, § 337. [12]

In *Thomas v. State*, 333 Md. 84, 634 A.2d 1 (1993), we reviewed extensively the constitutional protections against cruel and unusual punishment. There, we said that a sentence is unconstitutional only if it is "grossly disproportionate" to the crime committed by the defendant. *Id.* at 95, 634 A.2d 1. *See also Solem v. Helm,* 463 U.S. 277, 288, 303, 103 S.Ct. 3001, 3008, 3016, 77 L.Ed.2d 637 (1983). We also recognized that "because impermissible disproportionality will rarely be found, most cases can be resolved by a threshold comparison of the crime committed to the sentence imposed, and a more detailed comparative analysis within and between jurisdictions will be required only when the threshold comparison suggests gross

---

**10.** U.S. Constitution, Amendment VIII provides:

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted."

**11.** Article 16 of the Maryland Declaration of Rights provides:

"That sanguinary laws ought to be avoided as far as it is consistent with the safety of the State; and no Law to inflict cruel and unusual pains and penalties ought to be made in any case, or at any time, hereafter."

Article 25 of the Maryland Declaration of Rights provides: .

"That excessive bail ought not to be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted, by the Courts of Law."

**12.** Section 337 provides in pertinent part:

"Every person ... who shall be convicted of the crime of kidnapping ... shall be guilty of a felony and shall be sentenced to the penitentiary for not more than thirty years."

disproportionality." *Id.,* 333 Md. at 94, 634 A.2d 1. We further stated:

> "As Justice Powell indicated for the Court in *Solem,* all criminal sentences are subject to Eighth Amendment proportionality review but only rarely will an extensive review be required. Common sense and experience teach that, in a vast majority of cases, an appellate court, faced with an Eighth Amendment contention, can quickly reach the conclusion that the sentence is not unconstitutionally disproportionate to the crime. Beyond those cases, the degree of review required may vary from case to case; one case may require much more extensive analysis than another."

*Thomas, supra,* 333 Md. at 95, 634 A.2d 1 (quoting *Minor v. State,* 313 Md. 573, 587, 546 A.2d 1028 (1988) (Eldridge, J. concurring)). We then set out guidelines for a court when reviewing a purported unconstitutionally cruel and unusual sentence:

> "In considering a proportionality challenge, a reviewing court must first determine whether the sentence appears to be grossly disproportionate. In so doing, the court should look to the seriousness of the conduct involved, the seriousness of any relevant past conduct as in the recidivist cases, any articulated purpose supporting the sentence, and the importance of deferring to the legislature and to the sentencing court."

*Thomas, supra,* 333 Md. at 95, 634 A.2d 1.

The sentences here imposed for the crimes against McCrae—assault with intent to maim, kidnapping, and committing a racially motivated crime—are not grossly disproportionate. Nor was the ten-year sentence for conspiracy to commit a racially motivated crime against Guillory grossly disproportionate. Indeed, the misconduct for which Ayers was convicted was egregious in the extreme and the sentences are within permissible statutory and common law limits. We therefore hold that, considering all the circumstances, these sentences are not unconstitutionally disproportionate. Moreover, we have consistently held that a sentencing judge is

vested with considerable discretion, *see State v. Dopkowski,* 325 Md. 671, 679, 602 A.2d 1185 (1992); *Smith v. State,* 308 Md. 162, 166, 517 A.2d 1081 (1986); *Reid v. State,* 302 Md. 811, 819, 490 A.2d 1289 (1985); *Logan v. State,* 289 Md. 460, 480, 425 A.2d 632 (1981), and these sentences fall within the exercise of that broad discretion. We conclude that this is not one of those "rare cases" where the sentence violates the Eighth Amendment or Articles 16 and 25 of the Maryland Declaration of Rights. *See Thomas, supra,* 333 Md. at 102–03, 634 A.2d 1.

 The Attorney General suggests that the court erred when it imposed separate consecutive ten-year sentences upon Ayers for the counts of the indictment charging conspiracy to commit a racially motivated crime, one as to Guillory, the other as to McCrae. In actuality, however, the court imposed but one ten-year sentence for this offense, i.e., the conspiracy against Guillory. The court did not impose any sentence for the conspiracy to commit a racially motivated crime against McCrae; instead, it merged the count charging conspiracy into the count charging the commission of the racially motivated crime against McCrae under § 470A, for which it imposed a sentence of ten years.

We recognized in *Jordan v. State,* 323 Md. 151, 591 A.2d 875 (1991), that only one sentence can be imposed for a single common law conspiracy, no matter how many criminal acts the conspirators agreed to commit. The unit of prosecution, we said, is the unlawful agreement or combination rather than its criminal objectives. 323 Md. at 161, 591 A.2d 875. Accordingly, there was thus but one conspiracy involved in this case, namely that Ayers and Riley together agreed to go out and look for black people to assault. For this, only one ten-year sentence was imposed for that single conspiracy, namely that imposed for the conspiracy against Guillory. The guilty finding that Ayers conspired to commit a racially motivated crime against McCrae was merged into the count charging the commission of a racially motivated crime under § 470A, upon which a ten-year sentence, as authorized by the statute, was

imposed. As we see it, therefore, there was only one sentence of ten years imposed for the conspiracy offense and therefore the total sixty-year sentence imposed by the court was not unlawful.

*AS TO THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY UPON THE COUNT OF THE INDICTMENT CHARGING CONSPIRACY TO COMMIT A RACIALLY MOTIVATED CRIME UPON MYRTLE GUILLORY: JUDGMENT AFFIRMED; AS TO THE JUDGMENT ON THE COUNT OF THE INDICTMENT CHARGING ASSAULT WITH INTENT TO MAIM JOHNNIE MAE McCRAE: JUDGMENT AFFIRMED; AS TO THE JUDGMENT ON THE COUNT OF THE INDICTMENT CHARGING KIDNAPPING OF JOHNNIE MAE McCRAE: JUDGMENT AFFIRMED; AS TO THE COUNT OF THE INDICTMENT CHARGING THE COMMISSION OF A RACIALLY MOTIVATED CRIME UPON JOHNNIE MAE McCRAE IN VIOLATION OF ARTICLE 27, § 470A: JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.*

CHASANOW, BELL and RAKER, JJ., dissent.

BELL, Judge, dissenting in which CHASANOW and RAKER, JJ., join.

The majority holds that statements about what the appellant said during the 7–Eleven incident were admissible to prove the appellant's motive for committing those acts for which the appellant was on trial, since an element essential to the State's case is that the victim's race caused the appellant to commit those acts. That is the special relevance which the State must prove the 7–Eleven incident evidence has to the case on trial. To arrive at that conclusion, the majority seems to read Maryland Code (1957, 1992 Repl.Vol.) Article 27, § 470A as requiring proof of "racial animus." [1] The majority

---

1. The majority does not use this phrase to define the elements of section 470A, dutifully adhering to the language of the statute. Indeed, it

points out that the testimony of the appellant's co-defendant Riley was that the 7–Eleven incident was the motivating factor for the acts for which the defendant is on trial and that that incident was "racial" in nature. It also relies on the testimony of one of the participants in the 7–Eleven incident, the rebuttal witness Lisa Walker, to corroborate the latter point. The majority seems to say that Walker's testimony, like Riley's, tended to establish the causal connection between the two incidents.

Having determined the special relevance of the 7–Eleven incident and that the appellant's involvement in it had been proven by the requisite standard, the majority, consistent with the analysis reiterated in *Terry v. State*, 332 Md. 329, 335, 631 A.2d 424, 427 (1993),[2] proceeded to weigh the probative value

---

intimates that proof of racial bias is not a critical element of the crime, suggesting that section 470A can be proven without any showing of racial bigotry. That is belied, however, by its treatment of the admissibility of the 7–Eleven incident evidence. The details of the 7–Eleven incident were supplied by the testimony of Lisa Walker, on rebuttal, and the appellant on cross-examination by the State. Whereas the focus of the appellant's testimony was primarily on the activities of the other participants in the incident, Lisa Walker testified that the appellant used racial epithets. Thus, the only conceivable import of Lisa Walker's testimony was to show that the appellant had a "racial animus" against black persons. If the 7–Eleven incident was the "motive" for the instant offense, it was what other people said and did to the appellant that supplied the motive. Because from that evidence, the majority suggests that it properly could be inferred that, in this case, the appellant acted because of the victims' race, it follows that the majority endorses proof of racial bigotry as an acceptable means of proving the motive that is an element of section 470A.

2. That test is:
"When a trial court is faced with the need to decide whether to admit evidence of another crime—that is, evidence that relates to an offense separate from that for which the defendant is presently on trial—it first determines whether the evidence fits within one or more of the *Ross* exceptions. That is a legal determination and does not involve any exercise of discretion.

"If one or more of the exceptions applies, the next step is to decide whether the accused's involvement in the crimes is established by clear and convincing evidence....

"If this requirement is met, the trial court proceeds to the final step. The necessity for and probative value of the "other crimes"

of that evidence against its prejudicial effect. To reach the conclusion that the former outweighs the latter, the majority starts with the premise that the probative value is great "because it took place only several days before the March 3 attacks upon the victims in the present case, and was relied upon by the State as the motivating factor for Ayers's action. This evidence was therefore relevant to establish that, contrary to Ayers's testimony that he did not act with racial motives in the early morning hours of March 3, he in fact committed the crimes upon the victims on that date because of their race." Majority opinion at 635. While also recognizing that its prejudicial effect is likewise extremely high, it holds nevertheless that the balance favors admission of the evidence, reasoning:

> The State was required to prove that Ayers perpetrated the crimes upon the victims because of their race. Manifestly, the evidence of the 7–Eleven store racial incident could properly be found to constitute the motivation underlying Ayers's criminal misconduct in this case; it was therefore admissible to prove the motive element under § 470A. Consequently, the necessity for and probative value of this evidence in the circumstances was properly determined to outweigh its prejudicial impact.

Majority opinion at 635–636.

Conceding that generalized evidence concerning a defendant's racial views does not suffice to prove motive, that only evidence actually connected with the offense will do, the

---

evidence is to be carefully weighed against any undue prejudice likely to result from its admission. . . . This segment of the analysis implicates the exercise of the trial court's discretion."
*Terry v. State,* 332 Md. 329, 335, 631 A.2d 424, 427 (1993), quoting *State v. Faulkner,* 314 Md. 630, 634–35, 552 A.2d 896, 898 (1989) (citations omitted). The reference to the *Ross* exceptions is to those set forth in *Ross v. State,* 276 Md. 664, 669–670, 350 A.2d 680, 684 (1976).

As will be seen *infra,* despite the appellant's denial that he made them, the trial court made no specific finding with respect to whether the State proved by clear and convincing evidence that the appellant used the racial epithets attributed to him by Lisa Walker. Nor does it appear that the trial court ever determined whether the prior bad acts evidence fits within one or more of the *Ross* exceptions.

majority characterizes the 7–Eleven incident evidence as a part of the causal chain leading to the offenses on trial. Finding "a 'tight nexus' between the February 29 and March 3 incidents," Majority opinion at 39, it holds that the admission of that evidence was neither violative of the first amendment, nor of the rule generally prohibiting the introduction of other crimes evidence. In footnote 9, the majority addresses the timing of the Walker testimony. It notes, however, that, although it was admitted as rebuttal evidence, during the rebuttal stage of the trial, the trial court has discretion to allow evidence in rebuttal that could have been offered in the case in chief. Consequently, it says, that evidence was properly admitted in this case.

Whatever the majority may say, the evidence concerning what the appellant said during the 7–Eleven incident tends to prove and, I daresay, was offered to prove, the appellant's racial bigotry. Whether admitted in the State's case in chief to prove "motive" or as rebuttal evidence to refute the appellant's testimony, and that of his character witnesses, that he is not a racial person, the point is that the focus of the evidence was on what he said, from which the trier of fact was invited to infer that he acted with respect to the participants in the 7–Eleven incident because of their race and from that, to further infer that he acted the same way, for the same reason, several days later towards the victim in this case.

## I

I disagree, first of all, with the majority's assertion that Walker's testimony was admissible, and, in fact, was admitted, to prove that the appellant committed the crimes because of the race of the victims and, thus, could have been offered in the State's case in chief. More important, I reject the majority's inference that motive, the critical element of the crime that the State must prove, may be proven in this case, by evidence of the racial bias of the defendant. Accordingly, I respectfully dissent.

To be sure, a violation of section 470A does require proof that the defendant committed the crimes against the victims "because of [their] race, color religious beliefs, or national origin." Thus, to sustain a conviction under that section in this case, the evidence must not only show that the defendant committed the underlying crime, but that he did so because of the victim's race.

What the appellant may have said, by way of racial epithets during the 7–Eleven incident may show, and certainly has some tendency to prove, that the appellant is a bigot. Because it may be assumed that a bigot is more likely to act on his or her bigotry, evidence of bigotry, *i.e.*, the uttering of the racial epithets, may be relevant to prove that the appellant's actions against the victims in this case were taken because the victims are black. That evidence, thus, may tend to establish a disposition relevant to the case *sub judice.* In that sense, then, the evidence has "special relevance." And given its "special relevance," it may be argued that it is not presented solely for the purpose of showing that the appellant is a person of bad character or generally is disposed to committing criminal acts. *See Harris v. State,* 324 Md. 490, 502, 597 A.2d 956, 962 (1991).

Simply because evidence may be relevant does not mean that it must be admitted. As indicated, the State has first to demonstrate that its probative value outweighs its prejudicial effect.[3] That cannot be accomplished in this case.

It is of course true that to prove a violation of section 470A requires that the State establish the appellant's "motive" for committing the crimes against those victims "because of [their] race." This does not mean, as I see it, that the State has to prove that the appellant is a bigot, *i.e.*, that he acted with "racial animus." Proving that the appellant is racially

---

**3.** In this context, prejudice refers, not to the tendency of the evidence to damage the defendant's case, but to its tendency to "arouse the jury's hostility or sympathy for one side without regard to the probative value of the evidence...." Edward W. Cleary, *McCormick on Evidence,* § 185, at 545–46 (3rd ed. 1984).

prejudiced or biased can, to be sure, lead to an inference as to why the appellant acted. "Motive" as contemplated by section 470A is not, in other words, synonymous with racial prejudice or bias. What the statute proscribes is the purposeful selection of a victim because of the victim's protected status, in this case, race. *See State v. Stalder,* 630 So.2d 1072, 1075–77 (Fla.1994); *State v. Mitchell,* 485 N.W.2d 807, 821–22 (1992) (Babitch J. dissenting), *rev'd sub nom, Wisconsin v. Mitchell,* 508 U.S. ——, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993). As Justice Babitch put it (485 N.W.2d at 824–25):

> Neither a perpetrator's bigoted beliefs, nor his or her motivation for intentionally selecting a victim because of a protected status are punished.... [I]t is the act of selecting a victim because of his or her race, color, or etc., that is proscribed. If the perpetrator seeks out a Jewish person to physically assault his intent is not just to injure, but to injure a Jewish person. He may be motivated by a hatred of Jewish people, a calling from God to sacrifice a Jewish person, or some other irrational motive. This law does not look at why the perpetrator sought out a Jewish person. It looks only to whether the fact that the victim was Jewish was a substantial factor in the defendant's purposeful choice of the victim.

Thus, while proof of the defendant's bigotry may be a means of proving that, in this particular case, the defendant acted as proscribed by the statute, that proof is not a necessary element of section 470A; the State may successfully prove the appellant's unlawful "motive" even though the appellant is not a bigot. As Judge Babitch pointed out (485 N.W.2d at 822, footnote omitted):

> Admittedly, the conduct prohibited by the ... statute can be proven by an extensive combination of facts that might include words uttered by a defendant. However, if words are used to prove the crime, the words uttered are not the subject of the statutory prohibition; rather, they are used only as circumstantial evidence to prove the intentional selection. Permitting the use of such evidence does not chill free speech. Just as words of defendants are frequently

used to prove the element of intent in many crimes without violating the First Amendment, words may be used to prove the act of intentional selection. It is no more a chilling of free speech to allow words to prove the act of intentional selection in this "intentional selection'" statute than it is to allow a defendant's words that he "hated John Smith and wished he were dead" to prove a defendant intentionally murdered John Smith.

If the "because of" language *must* refer to bigotry, then section 470A would punish an actor for his or her beliefs, and, as the Wisconsin Supreme Court said of that State's statute, it is unconstitutional because it directly punishes thought and has a chilling effect on speech. 485 N.W.2d at 815–816.[4]

The State contends in this Court as it did below and so sought to prove, that the precipitating cause of the defendant's commission of the crimes on trial was the 7–Eleven incident. In support of that proposition, it called Riley to testify as to what motivated him and the appellant. Riley testified that, after drinking beers at the appellant's home, he and the appellant decided to go "nigger hunting", to go looking for blacks to beat up. The decision to go "nigger hunting" was made, he said, in response to a confrontation, which he characterized as racial in nature, that occurred between him, the appellant, and a group of black teenagers at a 7–Eleven store a few days earlier. It was because he and the appellant were "kind of pissed off about what happened" that night and "a little hostile," that they decided to do something about it, *i.e.* "going out looking for trouble." Myrtle Guillory, one of the

---

4. I am aware that the Supreme Court has specifically stated that antidiscrimination laws requiring proof of motive are not rendered unconstitutional simply because that proof may implicate a protected characteristic. *Wisconsin v. Mitchell*, 508 U.S. ——, ——, 113 S.Ct. 2194, 2200, 124 L.Ed.2d 436 (1993). It is significant to me that the speech at issue in that case was directly relevant to the acts on trial. That was consistent with the Court's admonition that the admissibility of motive evidence remains subject to the rules of evidence relating to relevance, probative value and prejudice. *Id.* In this case, by contrast, the speech had little to do with the crime on trial except that the appellant's co-defendant said that the incident in which they were uttered motivated the crime on trial. *See* discussion *infra.*

victims, testified to Riley and the appellant chasing her and her friend and that, while chasing her, Riley continually yelled, "I'm going to kill you, you black bitch," thus, corroborating Riley's testimony as to why they were selected.[5] Testifying in his own defense, the appellant denied that he had a racial motive for committing the crimes. Significantly, although he acknowledged on cross examination that the 7–Eleven incident was racial in nature, he contends that he did not use racial epithets during that incident.

The State called Walker to testify, in rebuttal, both as to what the appellant did and said during the 7–Eleven confrontation. Specifically, she said that the appellant had, indeed, used racial epithets, among them "black bitch," "nigger" and "black motherfucker," may have pushed one of the young men down, and had chased her.

The appellant moved for a mistrial, arguing that Walker's testimony had "so prejudiced this jury that I fail to see how in the world that man can get a fair trial." The court denied the motion, opting instead to give a cautionary instruction as to the use of the evidence.[6]

---

**5.** Other than being chased, the other victim did not remember very much about the incident. Hence, she did not testify that the appellant used racial epithets while chasing her.

**6.** The appellant made a similar motion when the State cross-examined him about the 7–Eleven incident. That motion was also denied. As it did on this occasion, the court, at the appellant's request, gave a cautionary instruction, which was, at best, confusing. That instruction was:

Before the witness is called I want to indicate to you what we refer to in this world as a cautionary instruction. You have heard and you may hear more testimony from witnesses relative to matters that appear to be other crimes or other incidents that might lend themselves to being prosecuted as crimes. But none of that testimony that you glean that from is to be received by you as the possibility of that being a criminal act. It is just being offered to you as indication of certain factual representations relative to substantiating other proof that one or both of the parties intends to put before you. Now I know that sounds confusing. I am just suggesting to you that the indication of any witness of any other act done by the defendant in this case other than these acts that he is charged with today is not to

There is nothing in the record that suggests, not to mention reflects, that the trial court admitted Walker's testimony for the purpose of proving the appellant's motive. Indeed, all indications are to the contrary. The State offered "motive" evidence during its case in chief primarily through the testimony of Riley and one of the victims, Myrtle Guillory; through those witnesses, it sought to prove why the appellant committed the crimes against those particular victims. Having presented its motive evidence, the State never sought to reopen its case, either directly or indirectly. Nor, when offering justification for its cross-examination of the appellant about the 7-Eleven incident or the need for, and propriety of, permitting Walker to testify in rebuttal, did it even suggest that it was properly a matter to be proved in chief. And the trial court's ruling on the appellant's objection to being cross-examined about the 7-Eleven incident and his motion for mistrial in no way indicated that the court believed that evidence to be admissible in chief or that, by its ruling, it intended to permit the State to reopen its case for the purpose of receiving it.[7] In point of fact, the State was clear in noting

---

be received or considered by you or to be used by you in a determination of your ultimate decision in this case.

7. While, to be sure, the trial court has discretion to vary the order of proof, and admit, during the rebuttal stage of trial, evidence more properly admissible in the State's case in chief, *State v. Booze and Snead*, 334 Md. 64, 68–69, 637 A.2d 1214, 1216 (1994); *State v. Hepple*, 279 Md. 265, 270, 368 A.2d 445, 449 (1977); *Mayson v. State*, 238 Md. 283, 289, 208 A.2d 599, 602 (1965), we have been quite emphatic that, "to uphold an exercise of discretion by the trial court, it must be clear that the trial court was indeed exercising the particular discretion it purported to exercise." *Booze and Snead*, 334 Md. at 70, 637 A.2d at 1217, citing *Huffington v. State*, 295 Md. 1, 15, 452 A.2d 1211, 1217 (1982) and *Mays v. State*, 283 Md. 548, 553–55, 391 A.2d 429, 431 (1978). Consequently, where evidence that is not properly rebuttal evidence is offered during the rebuttal stage of trial, it will not be presumed that the court exercised its discretion and allowed the State to reopen its case and receive that evidence out of turn. A court may not exercise discretion unless it has considered all relevant factors. When allowing evidence out of turn is at issue, that means considering whether the reasons advanced are truly extraordinary, *see Dyson v. State*, 328 Md. 490, 502–03, 615 A.2d 1182, 1188 (1992), "the desirability of maintaining an orderly trial" process, will be thwarted if reopen-

that it called Walker to rebut the appellant's character evidence and his denial of being a racist or having used any racial epithets during the 7–Eleven incident.[8] That this is so is demonstrated by the fact that Walker's testimony was not so much concerned with describing what occurred during the incident, as it was about detailing what the appellant said during the incident.

Assuming that the State had offered the evidence to prove the appellant's motive, I would reach the same result. Whatever the admissibility of Walker's testimony as rebuttal evidence, an issue that will be addressed later, in my view, its prejudice outweighs its probative value and it should not be admissible to prove motive and, hence, it could not properly have been offered in the State's case in chief.

The State focused on the 7–Eleven incident, not the appellant's racial beliefs, as the precipitating cause of the appellant's actions toward the instant victims. Being the precipitating cause of a subsequent action may not necessarily be the same as being the "motive" for the action. In this case, this is clearly the case—the motive for committing the crimes does not equate with why the appellant went "nigger-hunting." Viewed from the State's perspective, the appellant's motive was because the victims were black; however, the reason the appellant decided to go "nigger-hunting" was because of what happened at the 7–Eleven. In short, the 7–Eleven incident was the motive for the motive for the commission of the crime, not the motive itself.

---

ing is allowed, *id.* at 503, 615 A.2d at 1188, and the defendant's ability to answer and otherwise receive a fair trial will be impaired. *See Hepple,* 279 Md. at 270, 368 A.2d at 449. In this case, the record simply fails to reveal any basis for concluding that the trial court exercised its discretion to reopen the State's case for the purpose of accepting evidence more properly presented in chief. Consequently, notwithstanding that the trial court has discretion to vary the order of proof, there is, on this record, no reason to believe that that is what it did, or even intended to do.

**8.** In fact, the State argued that it was appropriate "to confront and to explore character traits that aren't consistent with what character witnesses have said."

The 7–Eleven incident involved more than simply what *the appellant* did or said. Indeed, what the appellant did or said during that incident could not, in my opinion, be the motive for his commission of the crimes. Other than the implication which can be drawn from those actions and comments that he is a racial bigot, the appellant's actions and comments have absolutely no relevance to any issue *sub judice.*

It is tenuous at best to suggest that the fact that the appellant previously used racial epithets formed the motive for his future crimes. It is the fact that the 7–Eleven incident occurred, not necessarily what the appellant said, that Riley points to as the motivation for the crimes in the instant case. But even if it were deemed to be necessary to prove the facts of the 7–Eleven incident, the critical focus still would not be on what the defendant said; rather, logically, it would appear more appropriately to be on what the objects of the appellant's rage, *i.e.,* the black teenagers, did or said. What the appellant did, how the appellant reacted, what the appellant said, do not address at all his "motivation," borne of the incident. The most that can be said about Walker's testimony, in the light most favorable to the State, is that it demonstrates that the appellant had a pre-existing animosity or bias toward the racial group of which the victims are members. Thus, viewed in that sense, focusing on the appellant's actions and words during the 7–Eleven incident is an attempt simply to establish that the appellant is a racist, in this instance, or has a propensity, of the existence of which the proof of the instant crime would be evidence. On the other hand, focusing on what the teenagers did, or were perceived to have done, to prompt the appellant's reaction is all that is required to establish, and thus corroborate, what Riley said—that he and the appellant became angry as a result of that incident and determined to do something about it. What prompted the appellant's anger, I submit, is not what the appellant said or may have thought; rather, it is what the appellant thought was said and/or done to him.

It is well settled in Maryland that motive or intent[9] may be proven by prior conduct. *See Johnson v. State,* 332 Md. 456, 470, 632 A.2d 152, 158 (1993); *Harris v. State,* 324 Md. at 502–03, 597 A.2d at 962–63; *Harrison v. State,* 276 Md. 122, 155, 345 A.2d 830, 849 (1975). This is true even if the conduct is not directly concurrent. *Johnson,* 332 Md. at 470, 632 A.2d at 158. All that is required is that the prior conduct be " 'committed within such time, or show such relation[ship] to the main charge, as to make connection obvious,' . . . that is to say they are 'so linked in point of time or circumstances as to show intent or motive.' " *Id.* at 470, 632 A.2d at 158–159, quoting *Bryant v. State,* 207 Md. 565, 586, 115 A.2d 502, 511 (1955) and *Harrison,* 276 Md. at 155, 345 A.2d at 849. Of course, the prior conduct evidence must be relevant, *i.e.,* it must have a tendency to prove the proposition for which it is offered, *Dorsey v. State,* 276 Md. 638, 643, 350 A.2d 665, 668–69 (1976), in this case, motive. Thus, evidence that is relevant is also probative. And, "[t]he stronger the connection between the evidence and the proposition [for which it is offered]—the greater the tendency of proof—the more probative the evidence is." *Johnson,* 332 Md. at 474, 632 A.2d at 160.

When motive is an essential element of a criminal offense and proof of motive involves establishing prior conduct that either constitutes another crime or a prior bad act, evidence of that conduct is admissible, as the majority recognizes, only if its probative value outweighs its prejudicial impact. We have noted that, "[i]n arriving at the proper balance, not only must the evidence's special relevance and potential for prejudice be

---

**9.** At the threshold, it must be noted that intent and motive, though mental elements provable by prior conduct and other extrinsic evidence, are not precisely identical. "Motive is what prompts a person to act, or fail to act. Intent refers only to the state of mind with which the act is done or omitted." Black's Law Dictionary 810 (6th ed. 1990). When the motive relates to a characteristic common to the victim, the distinction becomes less clear; in fact, it becomes quite blurred. In this case, for example, the State contends that the appellant committed the acts of violence on the victims because they are black. It would follow that it would view the appellant's intent as being to harm a black victim.

considered, but its necessity, *i.e.*, whether other means of proof are available, and other relevant factors must be assessed as well." *Id.* at 473, 632 A.2d at 160. This is best accomplished

if there is on the part of the trial judge a constant cognizance of the need for showing that the "evidence is probative of a material issue other than character," . . . coupled with an unremitting appreciation of the significant potential for unfair prejudice that is likely to accompany the admission of [specific acts of sexual conduct] the necessary analysis in weighing functions are likely to produce an appropriate result.

*Harris,* 324 Md. at 499–500, 597 A.2d at 961, quoting *Huddleston v. United States,* 485 U.S. 681, 686, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771, 780 (1988).

Evidence of other crimes generally is inadmissible to prove the defendant's guilt of the offense for which the defendant is on trial, *Terry v. State,* 332 Md. 329, 334, 631 A.2d 424, 426 (1993); *Clark v. State,* 332 Md. 77, 83, 629 A.2d 1239 (1993); *State v. Faulkner,* 314 Md. 630, 633, 552 A.2d 896, 897 (1989), but is admissible, our cases make clear, to prove motive. *Terry v. State,* 332 Md. at 334–35, 631 A.2d at 426–427; *Harris v. State,* 324 Md. at 501, 597 A.2d at 962; *State v. Faulkner,* 314 Md. at 634, 552 A.2d at 898. Its admissibility is premised on such evidence having "special relevance," *Harris,* 324 Md. at 500, 597 A.2d at 961, *i.e.,* that it "tend[s] to show a particular disposition that is at issue, as opposed to showing only that the defendant is a person of bad character or has a disposition toward criminal activity in general." *Id.* In addition to special relevance, however, to be admissible, the evidence must be such that its probative value substantially outweighs its potential for unfair prejudice. *Id.* at 500, 597 A.2d at 961. Where the evidence is relevant to show a particular disposition that is at issue, "there must appear between the previous offense and that with which the defendant is charged some real connection other than the allegation

that the offenses have sprung from the same disposition." *Id.* at 502, 597 A.2d at 962.

Having already determined that "motive" as used in section 470A, and racial bigotry are not synonymous, *i.e.,* racial bigotry is not an element of section 470A, and that proof of racial bigotry has some relevance to the proof of motive, it becomes necessary to weigh the probative value of such evidence against its prejudicial effect. The results of that weighing will determine whether Walker's testimony is admissible as "motive" evidence. As we have seen, Walker testified primarily to what the appellant said, emphasizing that he used racial epithets during the confrontation in which she was involved. From that testimony, the majority and the State infer that the appellant is racially prejudiced and, in turn, from that conclusion, that, on the later occasion, he committed the crimes because of that prejudice, *i.e.,* because of the victim's race. Because, in other words, the appellant is a bigot, the argument must proceed, his motivation for both the 7–Eleven incident and the crimes on trial, springs from the same disposition. The State then asserts that, because *"racial animus" must be proven,* it follows that the probative value of Walker's testimony outweighs its prejudicial impact. The majority reasons that the Walker testimony about what the appellant said during the 7–Eleven incident is more probative than prejudicial because that incident was relied on as the motivating factor for the attacks and thus Walker's testimony was necessary. In my view, that is simply another way of saying that, in this case, "racial animus" must be proven and so evidence tending to prove it is more probative than prejudicial. I do not agree.

Certainly, that the appellant was engaged in a confrontation three days before in which he used racial epithets may permit the inference that the appellant acted as he did on that occasion out of hatred of or racial animus toward the victims. The inference from the 7–Eleven incident was that appellant was angered by the victims' behavior, not just their race. His racial epithets were most likely a form of retaliatory punish-

ment, *albeit,* also an indication of his bigotry. The connection between the appellant's bigotry and the present incident is not, as the majority suggests, "strong probative evidence of the defendant's [motive] on this occasion." *Harris,* 324 Md. at 502, 597 A.2d at 962.

Determining whether proffered evidence is unduly prejudicial requires consideration of several factors, "including the strength of [that] evidence . . ., the similarities between the [incidents], the interval of time that has elapsed between [them], the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility." Edward W. Cleary, *McCormick on Evidence,* § 190, at 565 (3rd ed. 1984) (footnote omitted). Painting one as a bigot is a devastatingly and inherently prejudicial comment on that person's character, whatever relevance to the case at issue that particular dispositional trait may have. Indeed, such evidence is quite likely to arouse the jury's prejudice and hostility toward the defendant. *See Eiler v. State,* 63 Md.App. 439, 453–54, 492 A.2d 1320, 1327 (1985). Consequently, where it is not a necessary element of proof, its probative value almost always will be outstripped by its prejudicial effect. If the appellant is a racial bigot one can infer from his former remarks that he was similarly motivated in the instant case, but that does not make his bigotry admissible. Given the inherent prejudicial nature of racial bigotry evidence and the fact that proof of that trait is not a required element of section 470A, we do not have the requisite assurance that the probative value of proof of the 7–Eleven incident outweighs its prejudicial impact. Moreover, the appellant's racial remarks were accompanied by assaults which constituted crimes quite similar to those on trial. From that, as the majority also recognizes, the jury easily could have its attention diverted and infer that because he committed the earlier act, he also committed the one on trial. In my opinion, it is patent that the prejudicial impact of Walker's testimony far outweighs any probative value it may have.

## II

Because it was admitted as rebuttal,[10] I think it appropriate to expand on whether the Walker testimony was proper rebuttal evidence. My analysis leads me to conclude that it was not.

It is well-settled in this State that what constitutes rebuttal testimony rests within the sound discretion of the trial court, whose ruling will not be reversed unless it constitutes an abuse of discretion. *State v. Booze and Snead,* 334 Md. 64, 68, 637 A.2d 1214, 1216 (1994); *State v. Hepple,* 279 Md. 265, 270, 368 A.2d 445, 449 (1977). When addressing whether a trial court has abused its discretion in determining and admitting rebuttal evidence, "[t]he proper inquiry ... is 'whether the evidence explains, or is a direct reply to, or a contradiction of, any new matter that has been brought into the case by the accused.' " *Booze and Snead,* 334 Md. at 70, 637 A.2d at 1217, quoting *Hepple v. State,* 31 Md.App. 525, 534, 358 A.2d 283, 290 (1976), *aff'd, State v. Hepple,* 279 Md. 265, 368 A.2d 445 (1977). When that inquiry reveals that evidence that does not meet these criteria has been admitted, the court will be found to have abused its discretion and, if the impact of the evidence is such as to be both "manifestly wrong and substantially injurious," *Mayson v. State,* 238 Md. 283, 289, 208 A.2d 599, 602 (1965) quoting *Kaefer v. State,* 143 Md. 151, 160, 122 A. 30, 33 (1923), *i.e.,* not harmless beyond a reasonable doubt, *see Dorsey v. State,* 276 Md. 638, 656–659, 350 A.2d 665, 676–678 (1976), to require reversal of the defendant's conviction. Pursuing that inquiry in this case leads inexorably to the conclusion that the trial court committed reversible error by admitting Walker's testimony as rebuttal evidence.

Viewed superficially, it may appear logical that, in calling Walker, the State was doing nothing more than attempting to

---

**10.** In footnote 9, the majority acknowledged that some of the evidence concerning the 7–Eleven incident was presented in rebuttal. It observed, however, that the trial court had the discretion to admit that evidence even though it more properly was admissible in the State's case-in-chief.

rebut the appellant's denials. The appellant denied being a racist and also denied making racial epithets during the 7–Eleven incident. Looking at the matter more closely, however, belies that interpretation. The appellant's denial that he is "a racial person" came in response to the question, asked on direct examination, "did you attack this woman for any racially motivated reason?" Following up on that answer, the State inquired immediately about the 7–Eleven incident. In response to the State's questions, the appellant clearly admitted that the incident did occur and conceded that it was racial in nature. Unlike Walker's testimony, however, he indicated that it was the group of black teenagers that "started yelling racial slurs." According to the appellant, the incident unfolded as follows:

> I went in to buy a case of beer and as I came out there was a countless number of black people standing out there and he had—me. We had left and when we left [Riley] was driving dangerously out of the parking lot and they started yelling racial slurs.

In response to the question what the group of black people were saying, the appellant stated:

> Honkey this, honkey that, learn how to drive, get a life, this and that. I asked him to turn around. We turned around. I went up, I pushed a guy and that was it. We turned around, we started to walk away. After we started walking away they were, all of the people who were originally there were on the other side of Lay Hill Road yelling more racial slurs after everything had happened and we were starting to leave. So I then again, we ran after them and then—

The appellant denied calling Walker "a black nigger bitch." During his direct examination, Riley had answered in the affirmative to the question, "was there a confrontation racial in nature that you and the defendant were involved in that night?" He also testified that it was the discussion of that confrontation that led to them deciding to go "nigger-hunting".

Walker's testimony did not explain, directly reply to, or contradict any new matter, material to the issue before the

court, that was brought into the case by the appellant. The appellant admitted the only thing that was relevant to the State's contention that the 7–Eleven incident constituted the motivation for the attack on the victims—that the incident did, in fact, occur. Maintaining one's innocence by denying the State's allegations does not bring new matter into the case which would justify rebuttal evidence. *Booze and Snead,* 334 Md. at 76 n. 5 637 A.2d at 1220 n. 5. That he added to his denial, "I am not a racial person," and called character witnesses in corroboration, do not, in my view, open the door so as to permit the State, by way of rebuttal, to prove that he is.

It is only in that very rare instance when character is an element of the crime that the State is permitted to prove specific prior acts reflecting the relevant character trait. Lynn McLain, *Maryland Evidence,* § 405.4, at 391–92. Such evidence is admitted as substantive evidence. *Id.* Where character is not directly at issue, the State may, of course, cross-examine the character witness about specific prior acts or crimes; however, it is bound by the witness's answer, *id.* at 392–94, and cannot, thereafter, offer extrinsic evidence to contradict the witness. *Id. But see Erman v. State,* 49 Md.App. 605, 632, 434 A.2d 1030, 1045–46, *cert. denied,* 292 Md. 13 (1981), *cert. denied,* 456 U.S. 908, 102 S.Ct. 1756, 72 L.Ed.2d 165 (1982). The State could have called its own character witnesses, but it could not offer extrinsic evidence of other crimes, other than relevant convictions, to impeach the character testimony. *See McCormick, supra,* § 91 at 818. The Walker testimony was inadmissible on this basis as well.

But not only was it improperly admitted, it was manifestly and substantially injurious in its effect upon the appellant's case. The duty of the trial court to ensure that proffered evidence is not unduly prejudicial also applies to the State's attempt to rebut character evidence if that attempt involves delving into prior crimes or bad acts. *McCormick, supra* at 569. The appellant having already acknowledged the motivating event and, indeed, provided the State with more ammunition for believing that it was the motivational event, Walker's testimony had no other effect, if not purpose, than to expose

the appellant as a racist. In the context of this case, this is tantamount to proving that the appellant was a bad person and, thus inviting the jury to take that into account when determining whether he committed the offenses with which he was charged. Evidence that a defendant charged with committing a crime because of the race of the victims is, or may be, a racist is like proving that a person charged with armed robbery is poor or needs money. *See Vitek v. State*, 295 Md. 35, 40, 453 A.2d 514, 516–517 (1982). Even if a person on trial for armed robbery denies needing money, that should not open the door to proof of a prior armed robbery where the person contended he or she was committing the robbery because he or she needed the money. It is also like proving that a person charged with distribution of cocaine has, on a previous occasion, distributed cocaine, evidence ordinarily highly prejudicial and, hence, inadmissible. This is not a case in which there are but two possibilities and the State's proof would establish one to the exclusion of the other. *Anaweck v. State*, 63 Md.App. 239, 246, 492 A.2d 658, 652 (1985) (prosecution for possession of cocaine with intent to distribute in which defense contended the cocaine was for personal use. Proof of two recent sales admissible to prove intent). *See Harris*, 324 Md. at 502, 597 A.2d at 962.

Inasmuch as I believe and have already demonstrated, that Walker's testimony is inadmissible to prove motive and, furthermore, given the context, has no special relevance and certainly must be outweighed by the prejudice that it can be expected to engender in the jury, I would reverse and remand for new trial the appellant's conviction under Article 27, section 470A. I would allow the assault with intent to maim and kidnapping convictions and sentences to stand, however.

CHASANOW and RAKER, JJ., join in the views expressed herein.