748 A.2d 67 (2000)
131 Md. App. 89
Jon-Mikael McKENZIE and Vaughn E. Green
v.
STATE of Maryland.
No. 1075, Sept. Term, 1999.
Court of Special Appeals of Maryland.
March 10, 2000.
*68 Chirag V. Patel (Chirag V. Patel & Associates, P.A., on the brief), Baltimore, for appellants.
Gary E. Bair, Asst. Atty. Gen. (J. Joseph Curran, Jr., Baltimore and Logan C. Widdowson, State's Atty. for Somerset County, Princess Anne, on the brief), for appellee.
Argued before EYLER, THIEME and SONNER, JJ.
THIEME, Judge.
This case arises from four criminal informations filed in the Circuit Court for Somerset County on June 18, 1998, charging appellant Jon-Mikael McKenzie and his co-defendant Vaughn E. Green[1] with *69 second degree assault, hazing, and reckless endangerment. In the first, McKenzie was charged with three offenses against Marques Polk; in the second, the named victim was Dwayne Motley. In the third and fourth, Green was charged in connection with offenses against the two named victims. The court called all four cases for trial on May 19, 1999, and McKenzie moved to dismiss the second count of the informations, the charge of hazing in violation of Maryland Code (1957, 1996 Repl. Vol.), Art. 27 § 268H, on grounds that the statute was unconstitutional. The court denied the motion and the case proceeded.
The defendants pleaded not guilty on an agreed statement of facts. McKenzie was convicted on the hazing counts, and the remaining counts were nolle prossed. The court sentenced McKenzie to 90 days in the Somerset County Detention Center, which was suspended, and 18 months' probation. It also fined him $500 and court costs. McKenzie filed a notice of appeal on June 18 and presents the following questions:
1. Is Article 27, section 268H of the Maryland Code, which prohibits the hazing of students, unconstitutional in that it is impermissibly vague and overbroad?
2. Does Article 27, section 268H of the Maryland Code unconstitutionally violate the First Amendment right to freedom of speech by regulating speech based on conduct?
3. Does Article 27, section 268H of the Maryland Code unconstitutionally violate the First Amendment rights to freedom of association and assembly?
We answer "no" to these questions, and we explain.

Facts
The following stipulated facts were adduced at the trial, after McKenzie agreed on the record to proceed in this way.
McKenzie was a member of the Kappa Alpha Psi Fraternity at the University of Maryland Eastern Shore (UMES). The faculty advisor of this fraternity had informed McKenzie that the hazing of pledges was not permitted, and McKenzie had agreed in writing that he would not engage in hazing.
Nevertheless, at an unofficial meeting of pledges on February 8, 1998, fraternity leaders told Marquez Polk and Dwayne Motley that they would be beaten as part of their initiation into the fraternity. If they did not agree to be hazed, they would not enjoy full membership privileges.[2] Over the course of the next two months, the men were struck, spanked, slapped, kicked, paddled, and caned "enumerable times." So severe were the beatings that the canes and paddles used often broke on the pledges, and the two named victims were rendered bloody on several occasions. McKenzie, among others, inflicted the beatings.
As a result of the beatings, both Polk and Motley eventually were hospitalized, presenting two main medical conditions: i) subcutaneous bleeding in the buttocks, and ii) gangrene in the tissue of the buttocks. Without medical intervention, both conditions are potentially fatal. Both men underwent surgery, during which physicians excised large amounts of tissue and performed skin grafts.

*70 Discussion
In this case of first impression, two young men submitted to serious and repeated beatings and sustained potentially life-threatening injuries because they wanted full membership in a college social fraternity. Consent notwithstanding, such battering has been illegal in Maryland since 1985. UMES has issued strong policy statements against using any sort of physical abuse during pledge initiations. The circuit court found appellant guilty under Maryland Code (1957, 1996 Repl. Vol.), Art. 27 § 268H, which prohibits the hazing of students. Yet, because paddling, caning, and various other forms of physical abuse seem to be a time-honored, if not closeted, initiation ritual in his college fraternity,[3] appellant comes before us, cloaked in the Constitution, straining to uphold this hoary tradition. His arguments, in our view, have little merit, and we stand stunned that appellant would so stretch the First and Fourteenth Amendments to escape the consequences of actions so pellucidly proscribed by state law and school policy. The instant appeal is the first challenge to Maryland's anti-hazing statute, but the issues before us today have been played out in cases before the high courts of other states. Authority weighs against appellant; we thus affirm the trial court.

I
In 1985, the General Assembly prohibited the hazing of students by enacting the statute now codified at section 268H of Article 27. This statute provides, in full:
(a) Haze defined.In this section "haze" means doing any act or causing any situation which recklessly or intentionally subjects a student to the risk of serious bodily injury for the purpose of initiation into a student organization of a school, college, or university.
(b) Violation constitutes misdemeanor; penalty.A person who hazes a student so as to cause serious bodily injury to the student at any school, college, or university is guilty of a misdemeanor and, on conviction, is subject to a fine of not more than $500, or imprisonment for not more than 6 months, or both.
(c) Consent of student not defense. The implied or expressed consent of a student to hazing may not be a defense under this section.
Md.Code (1957, 1996 Repl.Vol.), Art. 27 § 268H.
From the plain language of the statute, the State must establish that the defendant, under the statutory definition, hazes a student at any school, college, or university so as to cause serious bodily injury to that student. Lest there be any doubt about which activities might be included, the legislature defined hazing as doing any act or creating any situation for the purpose of initiation into a student organization that could recklessly or intentionally subject a student to the risk of serious bodily injury. Despite the statute's clarity, appellant argues that it is both overbroad and vague. We disagree.

A
Appellant first argues that the anti-hazing statute is overbroad, treating overbreadth *71 and vagueness as a single issue. We first examine it for overbreadth, which as part of the standing doctrine is a threshold issue. Because this statute neither infringes appellant's rights under the First Amendment, see infra, nor inhibits the exercise of these rights by others persons, we reject his challenge.
The judge-made doctrine of overbreadth is an exception to the general rule on standing. Normally, a litigant only has standing to vindicate his own constitutional rights, and he cannot challenge a statute on the ground that it might be applied unconstitutionally to other persons and in other situations not before the court.[4]Members of City Council v. Taxpayers for Vincent, 466 U.S. 789, 797-99, 104 S.Ct. 2118, 2124-25, 80 L.Ed.2d 772 (1984) (citing Broadrick v. Oklahoma, 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973); Thornhill v. Alabama, 310 U.S. 88, 104, 60 S.Ct. 736, 745, 84 L.Ed. 1093 (1940)). The doctrine of overbreadth, however, allows the court to reach and invalidate those laws that may prohibit the constitutionally protected speech of third parties. Vincent, 466 U.S. at 798, 104 S.Ct. 2118. "[E]ven ... a party whose own conduct may be unprotected" may challenge such laws under the doctrine of overbreadth. Id.
Lest "the exception to ordinary standing requirements ... swallow the general rule," id. at 799, 104 S.Ct. 2118, we determine whether the doctrine applies in a particular case by measuring "the likelihood that the statute's very existence will inhibit free expression." Id. We must find that the statute poses a realistic danger of significantly compromising the recognized First Amendment rights of persons not before this Court, before we can entertain a facial challenge for overbreadth. Id. at 801, 104 S.Ct. 2118. Appellant must show that the anti-hazing statute "`could never be applied in a valid manner'" or that, even though it may be validly applied to appellant and other similarly situated fraternity and sorority members, "it nevertheless is so broad that it `may inhibit the constitutionally protected speech of third parties.'" New York State Club Ass'n v. City of New York, 487 U.S. 1, 11, 108 S.Ct. 2225, 2233, 101 L.Ed.2d 1 (1988) (quoting Vincent, 466 U.S. at 798, 104 S.Ct. at 2125). These are tough standards to meet. The former standard "will not succeed unless the court finds that `every application of the statute create[s] an impermissible risk of suppression of ideas.'" Id. The latter "is justified only by the recognition that free expression may be inhibited almost as easily by potential or threatened use of power as by the actual exercise of that power." Id. (citing Thornhill, 310 U.S. at 97-98, 60 S.Ct. 736). Furthermore, where an ordinary criminal law is involved, "overbreadth claims, if entertained at all, have been curtailed." Broadrick, 413 U.S. at 613, 93 S.Ct. at 2917. Indeed, overbreadth is "strong medicine" to be used "sparingly and as a last resort." Id.; New York State Club Ass'n, 487 U.S. at 14, 108 S.Ct. at 2234. Accord Los Angeles Police Dep't v. United Reporting Publ'g Corp., ___ U.S. ___, ___, 120 S.Ct. 483, 489, 145 L.Ed.2d 451 (1999).
*72 Appellant's overbreadth argument, scrambled together with his contentions on vagueness, fails to show us how either standard applies here. Not only does he fail to apply properly the doctrine of overbreadth to his unique facts, but he also fails to cite the very cases that should form the basis for his argument. He has not addressed why he believes this statute to be facially invalid such that "`every application creates an impermissible risk of suppression of ideas.'" New York State Club Ass'n, 487 U.S. at 11, 108 S.Ct. at 2233 (quoting Vincent, 466 U.S. at 798, 104 S.Ct. at 2125). Nor has he shown how the statute inhibits the constitutionally protected speech of the larger public. Id. Instead, he merely asserts, without further comment, that the law "seep[s] into the realm of violating free speech." We fail to see how that is possible.
The State asks us to provide a narrowing construction of this statute, a task that we find to be unnecessary, for by its express language the statute is narrow already. Its parameters come into focus when we read all three parts of the statute in context with one another, as Wheeler v. State requires us to do. Wheeler v. State, 281 Md. 593, 596, 380 A.2d 1052 (1977) ("All parts of a statute are to be read together to find the intention as to any one part, and all parts are to be reconciled and harmonized if possible."). First, the statute reaches only conduct that is already proscribed under other Maryland criminal statutes. See, e.g., Maryland Code (1957, 1996 Repl.Vol, 1999 Cum.Supp.), Art. 27 § 12 et seq. (crimes of first and second degree assault and reckless endangerment); Maryland Code (1957, 1996 Repl. Vol.), Art. 27 § 337 (crime of kidnapping). In fact, its real effect is to bar a narrow band of actors from using the defense of consent for such criminal conduct. The statute does not reach, however, the students' rights to participate in fraternities, sororities, or other organizations. It does not reach such conduct as yelling at or insulting pledges. It does not reach such conduct as requiring pledges to don matching tee shirts, memorize silly songs, or run errands for and serve meals to regular members. It does not reach such conduct as requiring pledges to tutor underprivileged children or play intramural sports.[5] The statute only reaches that conduct "which recklessly or knowingly subjects a student to the risk of serious bodily injury." § 268H(a). Second, enforcement *73 only occurs when hazing actually causes serious bodily injury. "A person who hazes a student so as to cause serious bodily injury" is the only person reached under the statute. § 268H(b) (emphasis added).
Even if appellant had successfully argued overbreadth here, the statute would thus survive scrutiny, because it does not "reach a substantial amount of constitutionally protected conduct," as we will explain in sections II and III infra. Boos v. Barry, 485 U.S. 312, 329, 108 S.Ct. 1157, 1167, 99 L.Ed.2d 333 (1988). Further, courts in three of our sister states have likewise rejected constitutional challenges to anti-hazing statutes on the basis of overbreadth. The Missouri Supreme Court upheld the state's anti-hazing law, concluding that the "overbreadth challenge misses the constitutional mark by a wide margin." State v. Allen, 905 S.W.2d 874, 878 (Mo. 1995). Likewise, the Illinois Supreme Court rejected a strenuous overbreadth challenge in People v. Anderson, 148 Ill.2d 15, 169 Ill.Dec. 288, 591 N.E.2d 461, 465, cert. denied, 506 U.S. 866, 113 S.Ct. 193, 121 L.Ed.2d 136 (1992), in which defendants argued that the statute could prevent the ridicule of such groups as the Ku Klux Klan by counter-demonstrators. The court held that the argument failed because, as with Maryland's law, the statute in question reached only conduct that resulted in the bodily injury of a person. Id. at 466. An Ohio court also rejected an overbreadth challenge to that state's civil hazing statute. Carpetta v. the Pi Kappa Alpha Fraternity, 100 Ohio Misc.2d 42, 718 N.E.2d 1007, 1013-16 (Ct.Com.Pl. 1998).
Overbreadth is, then, but one constitutional catch phrase or conclusion that appellant hurls toward the instant case in the hope that something will stick. See Allen, 905 S.W.2d at 876 (appellant's brief "is ... little more than a casserole of constitutional catch phrases and conclusions, unadorned by legal analysis"). Appellant failed to make his case at the threshold, so we include no further treatment of the issue.

B
Just as appellant fails to prove that the statute is overbroad, he likewise fails to prove it is void for vagueness. A criminal statute may be void for vagueness if "first, it ... fail[s] to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; [or] second, it ... authorize[s] or even encourage[s] arbitrary and discriminatory enforcement." City of Chicago v. Morales, 527 U.S. 41, 56, 119 S.Ct. 1849, 1859, 144 L.Ed.2d 67 (1999). Maryland cases embody these two standards for determining vagueness. In Williams v. State, 329 Md. 1, 616 A.2d 1275 (1992), the Court of Appeals stated that a penal statute is vague only when it fails to "`be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties.'" Id. at 8, 616 A.2d 1275 (quoting Connally v. General Const. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926)). This fair notice principle "is grounded in the assumption that [citizens] should be sufficiently well-informed to choose between lawful and unlawful conduct." Bowers v. State, 283 Md. 115, 121, 389 A.2d 341 (1978). Additionally, we must find a statute void for vagueness when "it lacks fixed enforcement standards or guidelines and thus `impermissibly delegates basic policy matters to policemen, judges and juries for resolution.'" Eanes v. State, 318 Md. 436, 459, 569 A.2d 604 (quoting Grayned v. Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972)), cert. denied, 496 U.S. 938, 110 S.Ct. 3218, 110 L.Ed.2d 665 (1990). We need not find a statute vague, however, "`when the meaning of the words in controversy can be fairly ascertained by reference to judicial determinations, the common law, dictionaries, treatises or even the words themselves, if they possess a common and generally accepted meaning.'" Id. at 460, 569 A.2d 604 (quoting *74 Bowers, 283 Md. at 125, 389 A.2d 341). Indeed, the vagueness doctrine is designed to balance the need for criminal statutes "`general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited.'" Id. at 459, 569 A.2d 604 (quoting Colten v. Kentucky, 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584 (1972)).
The anti-hazing statute survives under both constitutional standards. As for providing sufficient notice, "it would have been an impossible task if the legislature [had] attempted to define hazing specifically [, because f]raternal organizations and associations have never suffered for ideas in contriving new forms of hazing." People v. Lenti, 44 Misc.2d 118, 253 N.Y.S.2d 9, 13 (N.Y.Co.Ct.1964). We cannot imagine, nevertheless, that the men and women who attend schools, colleges, and universities in Maryland, would be incapable of understanding which activities might be encompassed in the statutory definition of "haze." Aids to interpretation are available both in Maryland legal sources and from university administrators. Appellant focuses his attack on the legislature's use of the word "any," implying that the definition fails to give adequate notice of which activities would be forbidden. The plain language of the definition, however, confines "any" activities and situations to those that i) recklessly or intentionally ii) subject a student to the risk of serious bodily injury iii) for the purpose of initiation into a student organization. This definition clearly communicates to us that the legislature intended to curtail some very specific acts and situations that are widely known to be part of student initiations.[6] Proscribed acts and situations could include, but would not be limited to, paddling, beating and caning; depriving initiates of sleep or restroom access; forcing extreme physical exercise, e.g., requiring a student to do hundreds of push-ups or deep knee-bends; using foreign objects or substances in or on the body for the purpose of inflicting physical pain or humiliation; forcing consumption of alcohol, drugs or foodstuffs; and subjecting pledges to experiences such as "road trips," where extreme weather conditions, wild animals, or other threats to personal safety could create danger. Indeed, to ensure that appellant and his peers had adequate notice and understanding of the boundary between lawful and unlawful conduct, UMES administrators had issued guidelines proscribing any kind of activity that might be construed as hazing, *75 and they had informed fraternity leaders of those guidelines.[7]
The wording of the definition, moreover, is similar to that in the reckless endangerment statute:

Any person who recklessly engages in conduct that creates a substantial risk of death or serious physical injury to another person is guilty of the misdemeanor of reckless endangerment and on conviction is subject to a fine of not more than $5,000 or imprisonment for not more than 5 years or both.
Md.Code (1957, 1996 Repl.Vol., 1999 Supp.), Art. 27 § 12A-2(a)(1) (emphasis added). Persons who require information about the nature and quality of acts that might create criminal liability, as well as the required mental state, would do well to consult this longstanding statute and its interpreting cases.
Furthermore, both this Court and the Court of Appeals have upheld criminal statutes using terms and expressions far more amorphous than the words defining "hazing" in the instant case. In Bowers v. State, 283 Md. at 125-28, 389 A.2d 341, for example, the Court of Appeals upheld on a vagueness challenge a child abuse statute that used the term "cruel or inhumane treatment." In Eanes v. State, 318 Md. at 461, 569 A.2d 604, that Court held that the phrase "loud and unseemly noises," used in a disorderly conduct statute, was not vague. More recently, the Court of Appeals upheld Maryland's drug kingpin statute when the definition of that term was challenged for vagueness, Williams v. State, 329 Md. at 8-15, 616 A.2d 1275, and this Court held that the words "alarm" and "serious annoyance" in Maryland's harassment statute are not vague. Galloway v. State, 130 Md.App. 89, 744 A.2d 1070 (2000). See also Boyer v. State, 107 Md. App. 32, 666 A.2d 1269 (1995) (statute criminalizing possession of machine gun for "offensive" or "aggressive" purposes not void for vagueness), cert. denied, 341 Md. 647, 672 A.2d 622 (1996); Anderson v. State, 89 Md.App. 712, 599 A.2d 861 (1991) (the term "dosage unit" in drug statute not vague); Caldwell v. State, 26 Md.App. 94, 337 A.2d 476 (1975) (mens rea definition in telephone misuse statute not vague).
In contrast, we note that when Maryland courts have held statutes and ordinances void for vagueness, the enforcement action challenged had created an absurd result, explicitly illustrating for the court the problems with the statute. In the case In re Leroy T., for example, the Court of Appeals struck down a Baltimore City ordinance prohibiting the possession of burglary tools. The ordinance enumerated several specific tools, then included a catchall clause prohibiting possession of "[a]ny other device or article [c]ommonly used, designed or specially designed for criminal use." In re Leroy T., 285 Md. 508, 510, 403 A.2d 1226 (1979). Leroy T., a juvenile, was adjudicated *76 delinquent for possession of pliers that he used as he attempted to steal a car. Id. at 509, 403 A.2d 1226. While not a part of the Court's stated rationale, we find it obvious that every homeowner in Baltimore could have been criminally liable under the trial court's construction of the ordinance. More recently, the Court of Appeals struck down as unconstitutionally vague a juvenile curfew ordinance in Frederick. See Ashton v. Brown, 339 Md. 70, 660 A.2d 447 (1995). In that case, Frederick teenagers who had been arrested for curfew violations under the ordinance sought declaratory judgment against city officials regarding its constitutionality. The ordinance made exceptions to the curfew for unaccompanied minors who worked during restricted hours, minors running errands for their parents, and for any "child attending a cultural, scholastic, athletic or recreational activity supervised by a bona fide organization...." Id. at 89, 660 A.2d 447. The teens had been arrested at a youth-oriented event sponsored by a local Chinese restaurant. Id. at 82, 660 A.2d 447. The Court struck down the ordinance because, in the words of Judge Eldridge, it did not clearly define which organizations law enforcement should consider to be "bona fide":
It must be possible for citizens to decide whether an unaccompanied seventeen year old might be detained in Frederick under the curfew ordinance for attending a midnight church service, a baseball game that ran into extra innings, a concert at Hood College, or a movie that ended after eleven.
Id. at 89, 660 A.2d 447. To arrest students leaving commercial movie theaters (presumably not bona fide organizations as local officials construed the ordinance) but to refrain from arresting students leaving a concert at a local college (presumably a bona fide organization) would be absurd. We see no such absurdity in the trial court's construction of the anti-hazing statute.
We also cannot see how this statute authorizes arbitrary enforcement under the second constitutional standard, and promotes, in appellant's words, "a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections." First, by its plain language, the statute is aimed at a clearly delineated body of individuals: those persons who initiate students into organizations at schools, colleges and universities. Second, to be found guilty of violating this statute, a defendant must have hazed a student "so as to cause serious bodily injury." In other words, the hazing victim must have sustained serious physical injury. "Certainly," wrote Illinois Chief Justice Miller in Anderson, "police have little discretion in deciding what is and is not physical injury." 169 Ill.Dec. 288, 591 N.E.2d at 468. Indeed, persons of common intelligence need not guess at that term's meaning. See Broadrick, 413 U.S. at 607, 93 S.Ct. at 2913 (citing Connally, 269 U.S. at 391, 46 S.Ct. at 127). If a defendant had cause to question the exercise of discretion by police, Maryland judges could rely upon other statutes and their interpreting cases as aids to construction. The term "serious bodily injury," for example, which is undefined in the anti-hazing statute, is analogous to "serious physical injury," which is expressly defined by Maryland's assault statute.[8]See Md.Code, Art. 27 § 12(c).
Finally, even if Maryland authority in this area were inadequate to support our holding, our sister states' anti-hazing statutes *77 have survived vagueness challenges. See, e.g., People v. Anderson, 169 Ill.Dec. 288, 591 N.E.2d at 461; State v. Allen, 905 S.W.2d at 874; Carpetta v. The Pi Kappa Alpha Fraternity, 718 N.E.2d at 1007. See also Buttny v. Smiley, 281 F.Supp. 280 (D.Colo.1968) (upholding anti-hazing rule at University of Colorado). In fact, in 1964, a New York county court upheld an anti-hazing law far less carefully crafted than Maryland's statute. This early New York law, which has since been rewritten with greater care, failed to define "hazing" and specify whether consent could be used as a defense to a hazing charge. Nevertheless, the court refused to dismiss the indictments of several students at Nassau County High School who assaulted several other students as part of an initiation ritual. See People v. Lenti, 253 N.Y.S.2d at 9. Maryland's statute is significantly more precise than this early and clumsy attempt to curtail student hazing, and we affirm it on the grounds that it is not vague.

II
Appellant's next argument, that the anti-hazing statute restricts free speech on the basis of content, strains credibility by subjecting improbable hypotheticals to twisted analysis. By prohibiting "any act" or "causing any situation which ... intentionally subjects a student to the risk of serious bodily injury," appellant argues, the legislature effectively voices its disagreement with any social or political statement, whatever it might be, underlying any act in which a fraternity member or member of a similar group might engage. To illustrate his views, he contends that if a fraternity member burned a cross, and a pledge who was sensitive to such blatant racial slights rushed in, only to be injured as he tried to extinguish the blaze, enforcement of the anti-hazing statute would encroach upon the member's right of political expression. Cross-burning, after all, is in itself protected activity under State v. Sheldon, 332 Md. 45, 629 A.2d 753 (1993). We find it hard to believe that such activity would be tolerated for the purpose of initiation in student organizations, which usually strongly emphasize among their members the values of cooperation, teamwork, friendship, and indeed, in fraternal groups, kinship.[9] More important, the anti-hazing statute is directed solely at unprotected pure conduct, whatever its motivation, rather than expressive conduct that is "`significantly embued with elements of communication to fall within the scope of the First and Fourteenth Amendments,'" such as the burning of flags or religious symbols or the wearing of black armbands. Texas v. Johnson, 491 U.S. 397, 404, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342 (1989) (quoting Spence v. Washington, 418 U.S. 405, 409, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974)) (holding that flag-burning as a form of protest is protected speech under the First Amendment). See also R.A.V. v. City of St. Paul, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (striking down ordinance proscribing cross-burnings under First Amendment rationale); Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (holding that school regulation prohibiting the wearing of black armbands unconstitutionally denied students the right to express opinions about Vietnam conflict); Sheldon, 332 Md. at 45, 629 A.2d 753 (holding that the burning of crosses and other religious emblems is protected speech under the First Amendment). Although expressive or symbolic speech *78 manifests itself as conduct, the underlying messages therein are clear, and the statutes that have been stricken down were by and large enacted because the very opinions behind the symbolic acts offended many in the legislature and the electorate.[10]
Our anti-hazing statute, on the other hand, functions more like hate crimes statutes. Like the anti-hazing statute, these laws were enacted to deter even further conduct that is otherwise prohibited, regardless of motive, and thus not constitutionally protected. They allow courts to enhance sentences beyond statutory caps when juries find that certain crimes were motivated by hatred based on certain factors. Because Maryland likewise proscribes much of the conduct reached under the anti-hazing statuteincluding assault and battery, reckless endangerment, and kidnappingour analysis here follows closely that used to uphold hate crimes statutes. See Wisconsin v. Mitchell, 508 U.S. 476, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993); Ayers v. State, 335 Md. 602, 645 A.2d 22 (1994), cert. denied, 513 U.S. 1130, 115 S.Ct. 942, 130 L.Ed.2d 886 (1995). As Justice Rehnquist so cogently explained in Mitchell:
The State argues that the statute does not punish bigoted thought ... but instead punishes only conduct. While this argument is literally correct, it does not dispose of Mitchell's First Amendment challenge. To be sure, our cases reject the "view that an apparently limitless variety of conduct can be labeled `speech' whenever the person engaging in the conduct intends thereby to express an idea." Thus, a physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment.
508 U.S. at 484, 113 S.Ct. at 2199 (citations omitted) (quoting United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968)). In Ayers, Chief Judge Murphy stated this principle with even greater precision: "[T]he record is devoid of evidence that, during the incident..., Ayers was engaged in any semblance of constitutionally protected speech." 335 Md. at 627, 645 A.2d 22.
In Mitchell, a group of young black men, including the named party, targeted and attached a white boy, spurred by a scene in the motion picture Mississippi Burning, in which a white man assaulted a black child who was praying. The group stole his athletic shoes and beat him senseless. The boy remained in a coma for four days. Id. at 480, 113 S.Ct. at 2196-97. The court that convicted Mitchell enhanced his sentence under the Wisconsin hate crimes statute after the jury determined that the attack was racially motivated. The Supreme Court upheld the statute, holding that states are free to single out "bias-inspired conduct because this conduct is thought to inflict greater individual and societal harm. The State's desire to redress these perceived harms provides an adequate explanation for its penalty-enhancement provision over and above mere disagreement with offenders' beliefs or biases." Id. at 487-88, 113 S.Ct. at 2201 (citations omitted) (emphasis added). Likewise, we hold that Maryland's interest in preventing the injury and death *79 of students at its institutions of learning adequately justifies any slight infringement of free speech or expressive conduct that could arguably occur when the anti-hazing statute is enforced. Appellant's behavior and other similar assaultive actions are by no means protected speech and, instead, are unprotected conduct prohibited under statutes other than the anti-hazing law. We thus affirm.

III
Appellant's final argument, that the statute subjects those associated with fraternities and other student groups to criminal penalties for mere affiliation, is equally baseless. Extending his vagueness argument, appellant claims that the anti-hazing law infringes upon the freedoms of association and assembly guaranteed by the First Amendment, because it penalizes "activities associated with being a member of the group." He is wrong.
First, the plain language of the statute directly contradicts appellant's spin on the issue. To be charged under the statute, a person must "haze[ ] a student so as to cause serious bodily injury." He must do that act or cause that situation either intentionally or recklessly. Even if a group member observes such an act or situation from the sidelines, it is unlikely that he would be charged under the statute, if he were truly a non-participant.
Second, as we explained above, the state may prohibit "violence or other types of potentially expressive activities that produce special harms"in this case, significant physical injury"distinct from their communicative impact," because "such practices are entitled to no constitutional protection." Roberts v. United States Jaycees, 468 U.S. 609, 628, 104 S.Ct. 3244, 3255, 82 L.Ed.2d 462 (1984). Likewise, such harms are distinct from their associational impact, as the Supreme Court held in Roberts. Id. Roberts addressed the constitutionality of the Minnesota Human Rights Act. The state found that the national by-laws for the Jaycees violated this act by not allowing the full and equal participation of women in the organization. Id. at 614-15, 104 S.Ct. at 3247-48. The Court rejected the organization's assertions that the law infringed upon the male members' freedom of association, explaining that "[i]nfringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." Id. at 623, 104 S.Ct. at 3252. The Court found that Minnesota's compelling interest in eradicating discrimination against its female citizens justified the impact on the male members' associational freedoms. Id. Maryland's anti-hazing statute does not even go so far as to alter the face of student organizations as did Roberts, which affected the Jaycees and other all-male organizations. Nothing in the anti-hazing statute "limits the members and prospective members of Kappa Alpha Psi or any organization from meeting at any time and place they may choose," Allen, 905 S.W.2d at 878; nor does it have any effect on the group's ability to choose its new members.
Fraternities, sororities, clubs, and athletic teams have long enriched student life, and our holding today does nothing to threaten the existence of such groups on Maryland campuses. Group initiations, however, should not entail violence or endanger would-be members. This State should keep its students safe in situations where peer pressure and the fear of losing face propels initiates to submit to conduct that strays well beyond the boundaries of criminal liability. A series of campus tragedies in Maryland and other states showed that, in 1985 and even today,[11] the student *80 perpetrators of violence have shielded themselves from punishment behind the defense of consent. According to the legislative history, the General Assembly sought to close that loophole.[12] We find that the legislative records, along with our other research, support our view that Maryland has a compelling interest in preventing violent or dangerous initiation activities on campuses, and that the student groups regulated by this statute lose no significant First Amendment freedoms when it is enforced. We thus find no validity in appellant's final challenge.
We expect that our holdings today will disappoint some alumni recalling their student days through the mists of fond memories.[13] Yet, to believe that beatings, *81 mock kidnappings, forced binge drinking, and similar activities are necessary tests of an initiate's loyalty,[14] because "it's always been done that way," is to engage in Orwellian "groupthink." Maryland has the power to regulate conduct that threatens public health, safety, morals or general welfare,[15] even if authorities have treated such conduct as grand old traditions and turned a blind eye in the past. Not too many years ago, some law enforcement officials might have considered lynching, date rape, and wife-beating to be grand old traditions as well. A rash of student injuries and deaths has focused public awareness on the abuses associated with campus initiations. The legislature reacted, and we hold that their statutory response survives constitutional scrutiny. We affirm.
JUDGMENT AFFIRMED.
COSTS TO BE PAID BY APPELLANT.
NOTES
[1] Notwithstanding the caption of this case, McKenzie is the sole appellant. Facts pertaining to Green's involvement in this matter are excluded.
[2] The stipulated facts show that the victims first attended an official pledge meeting at the fraternity house where they learned the formal requirements for fraternity membership. They were told that "no type of physical abuse would be involved in it. Indeed that was not to be tolerated." After the meeting, they were taken to a private student residence, a sort of unofficial fraternity house, where they learned that if they did not agree to be hazed, they would not be allowed to wear fraternity paraphernalia or participate in many of the club's events.
[3] Indeed, hazing has been such a time-honored traditionand problemin American educational institutions that the first anti-hazing regulation was enacted in 1874, when Congress passed a law prohibiting "plebe bedevilment" at our Annapolis neighbor, the United States Naval Academy. The first state to enact an anti-hazing statute was New York in 1894. Illinois followed suit in 1901. The 1980's saw a wave of such legislation because of an increase in student deaths related to hazing. See Darryll M. Halcomb Lewis, The Criminalization of Fraternity, Non-Fraternity and Non-Collegiate Hazing, 61 Miss. L.J. 111, 117-119 (1991); Gregory E. Rutledge, Hell Night Hath No Fury Like a Pledge Scorned ... And Injured: Hazing Litigation in U.S. Colleges and Universities, 25 J. of Col. & Univ. L. 361, 371-72 (1998). See also People of State of New York v. Lenti, 44 Misc.2d 118, 253 N.Y.S.2d 9, 14 (N.Y.Co.Ct.1964).
[4] The doctrine of standing, or lack thereof, is ordinarily treated in federal courts, whose jurisdiction is limited by Article III of the U.S. Constitution. Federal courts have established a three-prong test for the

irreducible constitutional minimum of standing.... First, the plaintiff must have suffered an "injury in fact"an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not `conjectural' or `hypothetical.' " Second, there must be a causal connection between the injury and the conduct complained ofthe injury has to be "fairly... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."
Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations omitted).
[5] We point out, however, that some of these activities might be prohibited by university policy, see infra, note 7, or by the national offices of many fraternities and sororities. Because they have realized the dangers of hazing, both local chapters and national offices of these groups have proscribed initiation activities not touched by Maryland's statute. The legislative record shows that the National Panhellenic Conference of 1979 resolved that its member organizations should refrain from

any action taken or situation created, intentionally, whether on or off fraternity premises, to produce mental or physical discomfort, embarrassment, harassment or ridicule. Such activities and situations include creation of excessive fatigue; physical and psychological shocks; wearing, publicly, apparel which is conspicuous and not normally in good taste; engaging in public stunts and jokes; morally degrading or humiliating games and activities; late night sessions which interfere with scholastic activities; and any other activities which are not consistent with the regulations and policies of the educational institution.
The Fraternity Executives Association adopted this policy statement, as did the University of Maryland Panhellenic Association. Additionally, some activities not reached by the Maryland statute are prohibited by the laws of other states. See Halcomb Lewis, supra, note 3, at 120-25 (comparing the definitions of hazing and the activities prohibited in the several states). It is, for example, a crime in many states to cause degradation or stress harmful to mental health. Id.
Some national groups, moreover, have sought to reform membership initiation as part of a larger effort to refocus their organizations. Literature on pledge training from Sigma Chi, one of the largest national fraternities, which was included in the legislative record, stresses activities that promote leadership training, academic achievement, and community service. See also The End of Animal House?, ST. LOUIS POST-DISPATCH, Jan. 21, 2000, at D10.
[6] Press coverage from the mid-1980's, including an article in the EVENING SUN found in the legislative record, chronicles several potentially dangerous hazing incidents in Maryland and elsewhere. In 1983, for example, pledges for Alpha Epsilon Pi at College Park were required to steal more than $1,000 in property as part of an initiation scavenger hunt, and Omega Psi Phi was banned from campus after members of the organization inflicted violence on a pledge. Another Maryland club, Gate and Key, was suspended in 1984 for forcing a new initiate to chug-a-lug an entire pitcher of beer, causing him to tear his esophagus. Andrew Compari, Measure to Outlaw Hazing Gets Praise, Criticism at UM, EVENING SUN, Jan. 29, 1985. Debra Silvertson, Director of Student Health Services at University of Maryland Baltimore County at the time, testified before the Senate panel that she had seen

injuries which include a broken ankle, a ruptured ear drum, bruising with significant blood loss in two bruised areas, a girl who slept with an entire fraternity to become a "little sister," and severe infections from blisters received during long marching in shoes that fit poorly.
In Massachusetts at American International College, a student died in February 1984 after he was forced to ingest a gallon of wine as part of a fraternity initiation. An autopsy revealed that his blood alcohol level was 0.48, or five times the state's recognized level of intoxication. John Kennedy, Hazing Death Rocks College in Massachusetts, DALLAS MORNING NEWS, Nov. 11, 1984, at 12A. A cadet at Texas A & M died in August of that year from heat stroke, after upperclassmen forced him to perform rigorous "motivational exercises." Id. A student in New Jersey at Monmouth College died after he was forced to lie in a mock grave he had dug and the earthen walls collapsed on him. Hazing: Legislator Wants to Ban Hazardous Rites, HARRISBURG PATRIOT, Aug. 25, 1986, at B1.
[7] Guidelines from the University of Maryland, included with the legislative record, listed the following activities as unacceptable hazing: paddling; requiring or forcing exercises or calisthenics; road trips, i.e., involuntary excursions; requiring or forcing exposure to uncomfortable elements; verbal harassment; physical harassment; requiring or forcing the wearing of apparel which is not in good taste; requiring or forcing nudity; requiring or forcing consumption of any liquid or solid substance; any activity that would degrade or otherwise compromise the dignity and free will of the individual; any activity that would reflect poorly on the fraternity system; any action that would place the individual in immediate danger; any activity involving mental abuse; any illegal activities; any action which prevents the individual from performing activities necessary to maintain normal bodily functions; any activity contrary to an individual's genuine morals; any deception designed to convince the pledge that he will not be initiated; throwing harmful substances, i.e., oil, syrup, flour, etc., on any aspiring member; any type of personal servitude which may be demeaning; forcing aspiring members to do any physical work without help from the brotherhood; or any kind of mental or physical disciplinary action against an aspiring member. All fraternity and sorority presidents and pledge educators were required to acknowledge, in writing, their intent to abide by the policy.
[8] Maryland Code (1957, 1996 Repl.Vol., 1999 Cum.Supp.), Art. 27 § 12(c) states:

"Serious physical injury" means physical injury which:
(1) Creates a substantial risk of death;
(2) Causes serious permanent or serious protracted disfigurement;
(3) Causes serious permanent or serious protracted loss of the function of any bodily member or organ; or
(4) Causes serious permanent or serious protracted impairment of the function of any bodily member or organ.
[9] During oral argument, appellant's counsel raised another examplethat a fraternity might require initiates to participate in acts of civil disobedience. He suggested that those pledges might fall victim to overly aggressive law enforcement as a result, as did some students at Kent State University during demonstrations against American involvement in Vietnam. As with the cross-burning, we find this scenario improbable. Hazing activities are intended to humiliate initiates and teach them "their place" in the organizational pecking order. We find it hard to believe that student clubs would use an activity as noble as political speech to accomplish this purpose.
[10] For example, the Texas legislature likely had in mind a scenario like the one played out in Johnson when it made flag-burning illegal. Protesters at the 1984 Republican National Convention marched through the streets of Dallas, chanting anti-business and anti-nuclear slogans and staging "die-ins" at several locations. Then,

[t]he demonstration ended in front of Dallas City Hall, where Johnson unfurled the American flag, doused it with kerosene, and set it on fire. While the flag burned, the protestors chanted: "America, the red, white, and blue, we spit on you." After the demonstrators dispersed, a witness to the flag burning collected the flag's remains and buried them in his backyard. No one was physically injured or threatened with injury, though several witnesses testified that they had been seriously offended by the flag burning.
Johnson, 491 U.S. at 400, 109 S.Ct. at 2537 (emphasis added).
[11] There have been several widely publicized hazing incidents within the past year. In February 1999, a student at Norfolk State University in Virginia was hospitalized for eight days, including two days in intensive care, after sorority sisters required her to do hundreds of deep knee bends and other exercises accompanied by their physical and verbal abuse. She sustained severe damage to her kidneys and leg muscles. Marc Davis, Students Fight for Reinstatement; Victim Says She Plans to Sue the Sorority Over Hazing Incident, VIRGINIAN-PILOT & LEDGER STAR, Jan. 6, 2000, at B1. At the University of Michigan, students were beaten in a fraternity initiation, and another student was shot in the groin with a BB gun. Jodi S. Cohen, U-M Probes 2nd Hazing, DETROIT NEWS, Jan. 7, 2000, at C1. In August 1999, Alfred University released a study showing that 75 percent of the 325,000 participants in sports sanctioned by the National Collegiate Athletic Association (NCAA) had to undergo some form of hazing to join a college team, and 20 percent of those surveyed reported hazing activities that crossed the line between youthful hijinks and significant danger. See Peter Schmuck, Solution to Hazing is Elusive, BALTIMORE SUN, Sept. 17, 1999, at 1D. Some reports also show that hazing activities have spread to middle schools and high schools, where sports teams, social cliques, and underground drinking clubs resort to Animal House-like activities to initiate new members. See id. (citing several incidents at Maryland high schools); Andrea Fine, USA, Desire to `Belong,' CHRISTIAN SCI. MONITOR, June 1, 1999, at 3.
[12] The summary of the committee report shows that the committee was strongly influenced by the testimony of Eileen Stevens, a national activist against student hazing. Stevens's son died of alcohol poisoning and exposure in 1978, after he was forced to consume a pint of bourbon, a bottle of wine, and a six-pack of beer and then locked in a car trunk during a hazing incident at Alfred University. Stevens told the committee that 30 students had died in hazing related incidents between 1979 and 1985, in initiatory activities ranging from being tied up and thrown from a moving vehicle to being forced to perform strenuous physical exercises in a steam room.

Stevens pointed out that the secrecy and peer pressure surrounding initiation rites create significant doubt as to whether victims truly consent to the activities. Students underestimate the severity of hazing before they submit to it. When there are abuses, even the complaining witnesses are unwilling to come forward, because many student groups operate in secrecy. Criminal LawHazing, Summary of Comm. Rep., Senate Judicial Proceeding Comm., S. 229, 1985 Legis. Sess. (Md.1985). Testimony from Debra Sivertson, a nurse at the University of Maryland, concurred:
The power of peer pressure cannot be emphasized enough. Students willingly subject themselves to these acts to be accepted. Many times they have no idea of how bad the hazing will be until they are put in the situation. By then, it is too late and they accept the consequences rather than "lose face" by backing out.
Id. Indeed, the pressure to belong played a part in the instant case.
Finally, because participation in social activities is voluntary, grand juries are reluctant to indict the abusers and victimizers. Id. Indeed, when a student in Springfield, Massachusetts died after being forced to drink a gallon of wine in a 45-minute period, the grand jury refused to indict other members of his fraternity. Kennedy, supra, note 6, at 12A. After the hearings, the Senate Judicial Proceedings Committee added a provision to the bill barring consent as a defense. Summary of Comm. Rep., supra.
[13] Some sources report that alumni and even current students who have experienced hazing want the traditions to continue without regard to the danger. A sociologist at Northwestern University, Jack Levin, reports that the alumni attitude seems to be, "I've gone through this. Why can't you?" Curtis J. Sitomer, Fraternity HazingThe Rush Now is to Initiate Reform, CHRISTIAN SCI. MONITOR, Feb. 21, 1985, at 23. A sorority member at Villanova University said: "There are 51 girls, how else are we supposed to get to know them? You'll remember a girl that hazed you, and if she was cool about it, you'll always think that she is awesome." Kevin Q. Parker, Concern Over Hazing Resurfaces as Rush Ends at Villanova U., U-WIRE, Jan. 21, 2000, available in Westlaw, 2000 WL 7270537.
[14] Hazing has traditionally been used to build unity and morale in groups of cadets at various military academies. Organizations haze initiates for this reason, and to show new initiates "their place" within the pecking order, or test loyalty and dedication. See Schmuck, supra, note 11. One pledge trainer at Villanova explained that hazing allowed new members to demonstrate their dedication to the organization and filtered out the people who lacked such dedication. Parker, supra, note 13.
[15] See, e.g., Slaughter-House Cases, 16 Wall. 36, 83 U.S. 36, 87, 21 L.Ed. 394 (1872) ("That power undoubtedly extends to all regulations affecting the health, good order, morals, peace and safety of society, and is exercised on a great variety of subjects, and in almost numberless ways."); Glenn Cade v. Montgomery County, 83 Md.App. 419, 425, 575 A.2d 744 (1990) ("A legislative enactment is within the permissible bounds of the police power if it is reasonably and substantially related to the public health, morals, safety and welfare of the people.") (citing Steuart Petroleum Co. v. Board of County Comm'rs, 276 Md. 435, 446, 347 A.2d 854 (1975)).